VINCENT K. COPES, ADM'R OF JOHN G. COPES, *vs.* OBED PEARCE, AND ELILABETH, HIS WIFE.—*December* 1848.

In cases of pedigree, the declarations of a deceased person, and of the deceased members of the family, are admissible to prove, *per se*, not only the issue, but the marriage, and the rule of evidence admitting such declaration, is not subject to the qualification, that cohabitation must be first shown to raise the inference of marriage.

It is upon the ground of necessity that these declarations are admitted, as an exception to the general rule excluding hearsay evidence, cases of pedigree being often incapable of proof, and depending entirely upon reputation.

The term "pedigree," embraces not only descent and relationship, but also the facts of births, marriages and deaths, and the times when these events happen.

Cohabitation *alone*, proved between parties, as man and wife, is sufficient to raise the presumption of legal marriage, when the parties have been long dead, and any declarations made by them, as to their being or not being married, may be used to strengthen or weaken this presumption.

APPEAL from the Orphans court of *Baltimore* county.

The appellees filed their petition in the orphans court of *Baltimore* county, on the 23rd of February 1846, alleging, that the appellant, as administrator of the estate of *John G. Copes*, deceased, had settled up said estate, and on the 17th of February 1846, had rendered to said court an account, whereby it appears that there remains in his hands, due said estate, the

sum of $2085; and alleges, that said *Elizabeth* is one of the distributees of said estate, and is entitled to one-fifth thereof, as an heir at law of the intestate, and prays that said administrator be required to make a legal distribution of the money aforesaid.

This petition the appellant answered, on the 26th of the same month, admitting that he had rendered an account of his administration, to which he refers for the particulars thereof. "But this defendant, (not admitting that said *Elizabeth* is entitled to claim as a next of kin and distributee of said *John G. Copes,* but leaving her to prove that she is such next of kin, and entitled, as distributee, of any distributable estate that may hereafter appear of said deceased as distributable,) avers, that the balance of said account, as rendered by him, is not claimable by any distributees of the deceased, inasmuch as respondent is a creditor of the deceased to an amount, exclusive of interest, of at least $1400, which claim he insists is to be satisfied out of said balance."

The claim of the administrator, the principal items of which are stated in the opinion, was then filed, and a mass of testimony taken, of which, all that is material to the case is also extracted and set out in full in the opinion of this court, delivered by his honor, *Judge Frick.*

The court below, on the 18th of August 1847, passed a decree, rejecting and disallowing the claim of the administrator, and ordering him to proceed to make distribution of the estate of his intestate, remaining in his hands at the rendition of his last account, among the parties entitled thereto. From this decree the present appeal was taken.

The cause was argued before DORSEY, C. J., SPENCE, MARTIN and FRICK, J.

By CHARLES F. MAYER for the appellant, who, upon the question of the relationship of *Mrs. Pearce* to the intestate, (the only point in the case involving questions of law,) insisted, that the appellees have not proved that *Elizabeth Pearce* is a next of kin of the intestate, and entitled to a distributive share of the estate.

The appellee, *Mrs. Pearce*, claims here as a sister of the half-blood to the intestate, by a marriage of *Giles Copes*, the father, prior to that of which the intestate and the appellant were the issue. No testimony, whatsoever, of such prior marriage is furnished; and the only reliance for showing that, is the declaration of *Giles Copes*, as well as to show, that *Mrs. Pearce* was his daughter, and of that first marriage. No cohabitation is shewn to raise inference of marriage, nor even the reputation of marriage; nor that *Mrs. Pearce* was the reputed daughter of that marriage. It will be difficult to present any case, I think, (particularly where the facts are not ancient,) *Starkie*, 1101; 3 *Marsh.*, 3; where declarations of a party have been received to prove identity and legitimacy of issue, without some preliminary proof by co-habitation, or by some facts apart from the declarations, of *a marriage*, to which to refer the issue. As to marriage, (the basis first to be laid,) these declarations are received as testimony only corroborative, where, by proved facts, as co-habitation, a presumption of marriage has been raised. *Buller, N. P.*, 294, 112. The *Berkely Peerage* case, which has defined the principle of hearsay for proof of pedigree, (4 *Camp. N. P. R.*, 401,) will not be found to warrant the admission of declarations to prove, *per se*, not only the issue, but a marriage too. There, there was preliminary testimony of the claimant being the reputed son of the party making the declaration, and under whom the estate was claimed by direct inheritance. The only question there was, as to legitimacy of the issue. In that case, too, there had been co-habitation and recognition, after a certain period of the party, as a legitimate issue of the alliance. Here there is no preliminary testimony whatsoever on which to engraft the declaration of *Giles Copes*, not even testimony of *Mrs. Pearce* being the reputed daughter. Further, the claim here is made under the intestate, and not, as in the *Berkely* case, under the person making the declaration. Can one standing in no relation to the right involved, by mere declaration regulate that right, and oust or impair the interest of one, who is, by unquestioned proof, entitled, and as by such proof appears, wholly entitled?

This is a point of important bearing, and the distinction I submit, is, I think, worthy of some reflection.

Attempts are made to shew a recognition of *Mrs. Pearce* as a sister, by the intestate and the appellant, and there is testimony to their calling her habitually, "*Sister Betsy.*" But this argues no positive belief of there being a kindred between them, as such kindly designations prevail between foster-brothers and sisters at times, and between those who have been educated in one family and intimately associated. But whatever force that term, "*Sister Betsy,*" may have, it is neutralised by counter-testimony here; one witness saying, that both appellant and intestate always called her *Mrs. Pearce;* and another, that when *Mrs. Pearce* was spoken of as entitled to inherit from him, the intestate scouted the notion, and considered her to have no more claim than the witness, a stranger, herself had. At furthest, however, the testimony as to this designation of her, would only show what these brothers, then very young, were taught, from some source or cause unexplained, to believe as to *Mrs. Pearce.* They must, from the testimony, have been very young when they so called her, as it appears she lived but a short time with them, after the marriage of which these brothers were born; and was herself married. And this designation of her prevailed only while she lived with *Giles Copes.*

We contend, then, that there is no testimony to retrench the admitted right of the appellant, as a next of kin, and to make *Mrs. Pearce* one. There is a moral right here to all these positions, because, as *Mrs. Potee* shows, the intestate wished and expected none but his brothers, *Vincent,* (the appellant,) and *Richard,* to have his estate. And this view of the deceased has the same force, whether dictated by affection, or by his recognising no other rightful kindred than these brothers.

By C. D. Barnitz for the appellees.

The argument of the learned counsel on this point is novel and ingenious. The conclusions, however, are not warranted by law. Vide 1 *Greenl. Ev. S.*, 103, 104, and in *note 2,* where objections against this kind of testimony are most strongly

urged. We have also received an impression different from the counsel's for the appellant, from examining the cases referred to. "The fact that a father, (*Buller N. P.*, 112,) by his testimony, (which is equivalent to declarations under certain circumstances,) is allowed to bastardize his children, after cohabitation is proved, does not show co-habitation the chief requisite in a case of this kind." But we will turn to the testimony. *Mrs. Eleanor Latcham* testifies, that she "often heard *Giles L. Copes* speak of his first wife, as the mother of *Mrs. Pearce.*" "Often heard him say, he was married to *Mrs. Pearce's* mother." "He appeared to be very fond of *Mrs. Pearce. Vincent Copes* and *Betsy* lived together with *Giles.* After *Mrs. Pearce's* marriage, she visited the family of *Giles Copes.* All treated her kindly, (*John Vincent* and *Richard*,) called her '*sister Betsy.*' They appeared extremely fond of her, and *John* treated her with great respect, as much so as brother could treat a sister," &c. *Mrs. Hale* knew *Giles L. Copes*, the father of *John G. Copes*, for twenty years. "Has often seen *Betsy Pearce* at his house." "She called him father. Has heard him say *Betsy Pearce* was the daughter of his first wife. *Vincent* acted towards her as a brother to a sister." "*Giles* called her children grand-children." *Mrs. Sarah A. Copes* was the last wife of *Giles L. Copes*, whose testimony will tend to diminish the share due her own child. She gives every particular relating to the marriage of *Giles Copes*, in *Virginia*, to the mother of *Mrs. Pearce*, as related by himself; also the birth of *Mrs. P.*, &c. She also speaks of her recognition by the family. *Sarah A. Dorsey*, "*Mrs. Pearce* went to see *John* at different times when he was sick. On the Friday before he died, he asked for her by the name of '*sister Betsy*,' and asked why she had not been there, he always appeared glad to see her. Has heard *Vincent* call her *sister Betsy.*" *Mrs. Beamer*, "*Mrs. V. Copes* introduced *Mrs. Pearce* as her sister."

It therefore appears that *Mrs. Pearce* lived with *Giles Copes*, as a daughter, before marriage, was treated and recognised by *Giles* as a daughter, and by *John* and *Vincent* himself, as a sister. That after marriage she visited the family,

and was still treated as a lawful daughter and sister; and her children, as grand-children, by *Giles L. Copes;* and always up to the death of *John*, with the respect due a sister. *Giles* narrates, time and again, the fact of his marriage with the mother of *Mrs. Pearce;* the time of the birth of his children in lawful wedlock; and the fact of *Mrs. Pearce* being the youngest child of his first wife.

The witnesses all agree to these facts.

The minutest particulars being given by the last wife of *Giles L. Copes*, the father of *John* and *Mrs. Pearce.* Thus much for a defence to the insinuations of him who lived in the same house, eat at the same table, and grew up under the care of her, on whom, until assailed by her own brother, the breath of suspicion never rested.

MAYER in reply:

We are inveighed against, because we put *Mrs. Pearce* to proof of her kindred with the deceased. Our legal right to do this is clear; our moral justification I have already indicated, in the proved fact, that the deceased never regarded her as entitled to share his property at his death, and died in the faith, that *Vincent* and another brother, (*Richard*,) would succeed to all he should leave. We believe and insist, that *Mrs. Pearce* is but a foster-sister of the deceased, and has no claim as next of kin. The record made by *Giles Copes*, father of the deceased, in his (*Giles'*) bible, does not note *Mrs. Pearce* as a daughter, nor any marriage prior to that of which the deceased and *Vincent* were the issue. But there is no evidence of any such marriage, of which *Mrs. Pearce* may be esteemed an issue. No testimony by witnesses, to a marriage, nor by co-habitation, is adduced. Declarations, without co-habitation, have never been received as evidence of marriage. They have been admitted to fortify the presumption of marriages from co-habitation, but only in that light and force. *Stark, 4th Pt.,* 224. 3 *Halsted,* 249. *Cowp.,* 593. In no case will it be found, that declarations of a party have, *per se,* sufficed to prove his marriage. Here brothers claim from a brother, and their kindred is undisputed; they do not recur to *Giles*

*Copes* to prove their relationship, by asking of his reported declarations the enumeration of his children. On what principle is his declaration to prove a marriage, and introduce another heir to impair an established claim of admitted kindred? Why is not some testimony of this prior and first marriage adduced? If the ceremony of the marriage could not be substantiated, why not some proof given of co-habitation? The event is not so ancient as to make such testimony impracticable, or not likely to be attained, and hearsay testimony is allowed in matters of pedigree, only from consideration of the necessity of the resort to traditional intelligence, because the facts are too remote to be reached by living testimony. 3 *Marsh*, 326, *Briney vs. Haun.*

We do not, by challenging *Mrs. Pearce's* claim as next of kin, dishonor the memory of *Giles Copes*, the father of the deceased. His designation of her as daughter, proves not that she was in fact his daughter. It may have been a term of affection and not of kindred, 3 *Halsted*, 249; but, at all events, it is not proof of kindred. *Giles* treated *Mrs. Pearce* as a daughter, and that is all that is to be deduced from the testimony. The cases show that declarations, such as are referred to him, have never been available to prove more than age, or time of birth, a marriage being first, actually or presumptively, proved. *Cowp.*, 593. This, too, is not a case strictly of pedigree, where declarations of far-off relations have been admitted, to show early relationship, and where a deduction of kindred was required, from a remote *propositus*. This is the case of a direct derivation of brother from brother. But even in pedigree tracings, marriages are shown by co-habitation, and not left blank, as here, and to be supplied by a declaration.

We insist, that there is no adequate testimony of *Mrs. Pearce's* relation as sister.

Perhaps the vague form of the decree, may not submit this point of kindred for decision, but it is desirable that the court should lay down the principles that bear upon it, so as to preclude doubt and litigation hereafter, under any future action of the orphans court in this case.

FRICK, J., delivered the opinion of this court.

*Pearce* and wife, by their petition to the orphans court of *Baltimore* county, represent, that *Vincent K. Copes*, the administrator of *John G. Copes*, deceased, had settled all debts due to, and from the estate, of which he is the administrator, and that there remained in his hands a large amount for distribution; that in right of the wife, as half-sister of the deceased, they are entitled to a distributive share of said estate, and pray the court to order the administrator to distribute the balance among the parties entitled.

The administrator, (who is a full brother of the deceased,) in answer to the petition, puts the petitioners to proof of *Mrs. Pearce* being next of kin; and further claims a large amount to be due him from the estate, which amount would, in a great degree, exhaust the balance in hand.

The administrator, in the course of his administration, and before the petition was filed in this cause, had presented to the orphans court, for its sanction, the account which is now the subject of controversy, the claims under which may be classed and specified as follows:

1. For money lent, $159.50.

2. For balance due on an alleged partnership, between the intestate and his administrator, as survivor of *John G. Copes & Co.*, and *M. V. K. Copes & Co.*, $883.49.

3. For a balance of wages, as clerk to the intestate in a grocery store, $83.33.

4. For bricks furnished to the deceased, and for a balance due at brick-yard, after the partnership (in making bricks) had ceased, $36.19.

5. For commissions on sales of brick *for* the deceased, and collections upon sales made *by* the deceased himself, subsequent to the partnership, $262.49.

6. For attendance of administrator's wife upon the deceased, $20.

To this account, (amounting to $1445.15,) there is attached the probat, in the usual form, by *Vincent K. Copes*, the creditor; and the probat then further certifies, "that at the same time appeared *James Carney*, and made oath on the holy

evangely, that the *goods, wares, &c.*, charged in the matter in the within account, *were sold and delivered,* as charged to *John G. Copes,* and at the prices therein charged.''

This is the character of the testimony, upon which the appellant relied in the first instance, before the orphans court, and the account was, of course, rejected.

The claim being thus repelled, the appellant sought to establish the several items of the account, by producing the books of the intestate in evidence, and by other testimony of witnesses, which is too voluminous to permit even an abstract; but having had the careful revision of the court, (separating what is illegal and incompetent from the mass,) we shall recur to, in such particulars, as are requisite and necessary in connection with the opinion here expressed.

The orphans court upon this testimony, disallowed the whole claim of the appellant, rejecting every item, and directed the administrator, (the appellant,) to make distribution of the estate of his intestate, remaining in his hands, among the parties entitled thereto, and from this order the present appeal *is* taken.

The claim upon the alleged partnership accounts, although not the first in order, seems to be the first in importance and amount. The parties were both brick makers in the city of *Baltimore,* and the operations of the intestate were carried on in two distinct brick-yards, between the years 1836 and 1840, until abandoned for a time in the latter year, when the intestate became engaged in the grocery business, from which the appellant deduces another claim for hire and service as clerk. It may be gathered from the testimony, that a partnership of some sort subsisted between the parties, by the declarations of the intestate, made to several of the witnesses. But when it commenced, during what period it was to continue, whether it related to one or both of the brick-yards, or what were its terms, are left uncertain. No particular period is assigned to this partnership by any witness. The declarations of the intestate produced in evidence, were in 1837, '38 and '39. The appellant himself has located it between the 6th of April 1838, and the 27th of February 1839, and upon this assumption an account has been stated between the parties, by *Stephen Lawson,* an

accountant, who says in his deposition, that the appellant "came to witness with the books, and stated that he was the surviving partner of his brother, *John G. Copes,* and he wished him to state an account from the books between the parties, taking this statement of the commencement and the termination of the partnership." Upon this statement of the appellant, that he was the surviving partner, not from the evidence on the books of its limitation, or of any terms of partnership, *Lawson* states this account. It is to be observed here, that these books produced to *Lawson,* are the private account books of the intestate, all the entries being in his own handwriting, not the slightest trace of any partnership account can be found in them, but the heading on two consecutive pages of one of the books, thus: *"John G. Copes & Co.,"* and *"Major V. Copes & Co.,"* in which some insignificant items of cash are charged, to the one $72, to the other $44, for the space of the three first months in 1839, and there, without any credits on either side, or without further trace of these accounts, they close. It is part of the appellant's statement to *Lawson,* that he was the surviving partner of *both of these* firms; and to support his claim for an account, within the period designated by himself, all the private accounts, books, of the intestate are produced and invoked to his aid, and the result of the accountant's labor is, that the sum before mentioned is generally due to the appellant, *without distinguishing between the two firms,* or what amount on each. To arrive at these results, *Lawson* says, for instance, that "he was regulated by the brick-yard account, by the sales shewn there of bricks by the deceased, and paid for to him." This "brick-yard account," purports to be the sales by the intestate, running continuously from June 1835 to January 1839, without interruption, or a sign or memorandum of a partnership sale. They are all ostensibly on the intestate's own account, and the extract from these sales to be carried to the partnership credit, for the period assigned to the partnership, has nothing to rest upon but the instructions given by the appellant to *Lawson.*

The books produced are six in number. There is no evidence that they are the books of a partnership. On the con-

trary, other witnesses discountenance the pretension. The intestate, it is proved, had two brick-yards. They may be the books of a *separate* concern. Another accountant, *Pretty-man,* who was called to examine them, says, "that he sees nothing in the books to indicate a partnership;" and *Caton,* the witness first brought to explain the books, says, "he could, in any case, *only* make out an account so far as the books go." "There might have been prior and subsequent transactions not in the books." That they contained no satisfactory evidence of a partnership, or of partnership accounts, is conclusive from the testimony of *Lawson,* an accomplished accountant, that the appellant "answered such questions as he put to him," and that he took *his* statement as to his being surviving partner, and as to thè period within which the partnership was limited. In all this, the evidence to sustain the partnership by the books is, so far, totally deficient.

To support the first items in appellant's account for moneys loaned, the intestate's cash book is produced shewing the entries to that effect. It is rather singular that there should be an hiatus in this cash account from April 1838, to April 1839, the very period assigned for the partnership, and *that it is manifestly produced by the abstraction of one or more leaves from the book.* The debits include the sums of $100, and $28, as borrowed from the appellant, and charged now as the first items in his present account; and the whole debits on the page added up, are said to be "carried over"—no credits appear after the 16th of April '38, and the continuation of the account, no where appears. *Peyton Rose* a bookbinder, to whom the book is shewn, "concludes that the book is not perfect, and thinks from the appearance at that place, that the sheet has been taken out, because that section shews it has not as many sheets as the other; without counting it, when the book is closed." But another new book of similar form and dimension, just purchased from a book-store, is produced, by *Henry Baehler,* a witness for the occasion, and is found to have the same precise defect; and is of course used to repel the guilty presumption as regards the other. We think it unsatisfactory from *Baehler's* own account of his agency in the

33    v.7

matter. "He was requested by *Vincent Copes*, to buy a book of that size;" and was not told why he was to buy the book. He went into the store and asked for a book of the size, and got this. Expects *Vincent Copes* will pay witness for his outlay for the book, as he asked him to buy it. We forbear comment upon this clumsy attempt to allay suspicion. For still the testimony of *Rose* remains, and the conclusive indications from which he points out the abstraction of the leaves. Besides this the balance of account was to be "carried over," from the former page. Whereto? is significantly asked by the counsel for the appellees. It does not appear; and without this continuation of the account, is it to be presumed in favor of the appellant, that the intestate is entitled to no credits? How was the court to proceed, without the deficient leaves of the cash book? That book purports to be an account of the entire cash transactions of the intestate. From that account the appellant extracts the proof of part of the charges made in his account. The credits after the 16th of April '38, disappear with the abstracted leaves. Not by the agency of the intestate; because he could have no inducement to destroy testimony going to discharge his own liability; the credit side of his account. The inducement lay the other way; in the way of the appellant, who was in possession of the books, and whose interest it was, that the credits, if any, should not appear. This court cannot say, that the hiatus in the cash account if filled up, might not afford an answer to all the claims of the appellant, up to the period of its resumption, April 20th 1839; particularly as it covers most of the time *selected* by the appellant as the period of the partnership. The books produced are otherwise effaced and mutilated, and even if the erasures do not bear upon the present enquiry, of which we cannot judge; yet, the glaring deficiency in the cash book, and the unsuccessful attempt to account for it, throws a suspicion upon the whole claim; which is not weakened by the original form of probat in which the account was first brought to the notice of the Orphan's court. It will be remembered, that *James Carney* was there produced by the appellant, who made oath "that the goods and wares charged in the account were sold and deliv-

ered at the prices therein charged," and this gross perversion is presented to the court by the appellant, as evidence that his claim is "just and true," when not a single article of merchandize is the subject of that account. Upon being afterwards examined, *Carney* testifies, "that having been an apprentice of the intestate in the year 1838, he was called upon by *Vincent Copes*, to go before the magistrate, to testify to the partnership, of which he had heard intestate speak in his lifetime; that he thought he was asked with reference to this fact of partnership only; but that he knows nothing about the books or business of the partnership, and does *not know whether one was indebted to the other..*" This was certainly an inauspicious commencement of the proof, the sequel of which is here developed.

An examination of *Lawson's* account, further discloses, that the appellant does not appear to have paid anything into the concern; and proceeds upon the assumption, that *John wound up the business*, and received all the money of the firm. And yet, this is distinctly negatived by a witness of the appellant, *Joseph Sanks.* He says "he became acquainted with *John Copes* in 1840, when he bought out *Gordon's* grocery store. *Vincent* was then settling up the business of *John's* brick-yard. *John* then stated that *Vincent* was in partnership with him in the brick business, *and was then settling it up.*"

Here then the onus is on the appellant in 1840, at the close of the partnership; and we may presume safely that it was not permitted to remain unsettled until the death of the partner, with such a balance as is claimed by the appellant in his favor; particularly as we find him afterwards, (as is inferred from the subsequent charges in his account,) acting in different subordinate relations to the intestate, as his clerk at one time, and as his salesman and collector at another.

And further to sustain this conclusion, that these and other matters of account were settled between the brothers, before the death of *John*, we have the concurrent declarations of both parties in confirmation of it. *Samuel Harner* says, that the intestate told him about a year before his death, "that he did not owe a dollar in the world," that "he did his business accord-

ing to his means." And to *Dorsey*, a few weeks before his death he said, "that he did not owe $10, except his doctor's bill." In connection with this, we take the declarations of the appellant to *Reese*, "that a day or two before a public sale of some of intestate's property, he had a conversation with appellant about settling up the intestate's estate; and appellant said he would have very little to pay for the debts of his brother; that he was not indebted over $100; that there were some small balances on the books in *his* favor, but the whole indebtedness would not amount to $100." And a closer examination of these books confirms this statement. In I. C., No. 3., is to be found an account opened in favor of appellant for "night-watching," in 1842, amounting to $107, at $1.25 per night, on which a small balance still appears due. In April 1843, in the same book, there is a credit to the appellant of $3.34, for three days; and in J. C., No. 1., there is a further credit to him, in 1843, of $66 and some cents, for 60 days service at $1,11, on which account a small balance remains in his favor. And these may well comport with the appellant's declarations to *Reese*, before the idea occurred to him, of reviving the partnership, with the settlement of which he had been charged in 1840; while at the same time they are utterly irreconcilable with the pretension, that the intestate could be indebted to his brother in an amount so large as this account proposes, and yet be struggling in his service by day's work, and night-watchings, at periods subsequent to this alleged claim, for about one dollar, each day.

The whole pretence is at variance with any theory that can be set up in the appellant's favor by a resort to the books of the intestate, as we find them; and is, in our opinion equally fatal to his subsequent charges in the account for commissions on sales and collections. That he was also in the employ of the intestate, some time in 1844, is in evidence. In what character only appears from the testimony of the several persons named in his account, to whom he either sold and delivered bricks, or collected the amount when sold by *John;* and upon which the commissions are charged that make up the residue of his claim against the estate. One item, selected

from the rest, will serve to shew the character of these claims, and in the opinion of the court is decisive of the whole.

On the 28th December 1844, the balance of the stock of bricks (121,225) is sold to *Phillips;* and we take his account of it as we find it in the evidence. "He first made a proposition to *John Copes* (the intestate,) for a purchase of all the bricks then in the yard. The proposition was not accepted. Then made a second proposition to him in presence of *Vincent.* This was accepted by both parties. At this time *Vincent* was attending more or less to *John's* business, and it was understood he was to count the bricks as *John* was unable to attend to the business of the yard from sickness. He always considered himself dealing with *John Copes.* The bricks were counted by witness and *Vincent,* in one day, as he thinks, from 10 A. M., to 3 or 4 P. M. The counting he considered the delivery." For this day's work we have the charge in this account of 10 per cent commission, being $92.55, and 25 cents per thousand for the delivery, $30.30, making together the sum of $122.85; and the rate and charge of commission is the same upon the remaining items; while the previous work done in the employ of his brother, and settled in his lifetime, appears to have been at the rate of $1.11 per day. In the cases of sales to *Allwine, Phoebus* and others, from an examination of their testimony, the bargain and purchase appears to be made from intestate, occasionly with, and at other times without, the agency of *Vincent.* In recurring further to the sale's book of the deceased, it will be seen that the accounts of *Kenny, Jenkins, Sisco,* and so on, upon which the commissions for collections are charged in this account of appellant's, are all marked, "closed by the deceased." How closed, and for what purposes, we are left to infer. It is of course an entry after the death; and not a word of explanation is offered to shew by whom; except from the fact that the books are produced by the administrator, (the appellant.) The very first account in the sales book, page 1, is an account with Major "*V. Copes,*" in which may be found the credit of bricks proved to have been furnished by him for the intestate, *while he stands charged with others to counterbalance this item.* Then follow the accounts said to

be "closed by deceased;" but *this account*, at the bottom, has evidently had some explanation or memorandum, which is now *totally erased and illegible*. Whether closed or not, cannot appear; and although it involves only a small portion of the account, (the sale or exchange of bricks on his own account,) how are the court to dispose of it? How can they say, that books thus mutilated, are reliable testimony for any purpose in a court of justice? Not a paper, or a single voucher produced by the appellant, in support of the claim which he would extract from them. He proves by oral testimony, the receipt of the intestate's money, and the books are referred to for the proof of its being paid over. Not one word however, is found in them of his agency or commissions. And if such agency existed, nothing to repel the presumption that the commissions were paid, or retained, as usual, in accounting for the collections. All is referred to these books. And with the manifest evidence, from actual inspection, that they have been revised since the death of the intestate; with no satisfactory explanation of the subsequent mutilations; we cannot impugn the judgment of the court below, that rejected them altogether. Without expressing any other doubts or suspicions than are conveyed by the decision itself, we feel bound to affirm the order and decree of that court, disallowing the whole claim of the appellant, and directing him to proceed to distribution, among the parties entitled.

The next question is, whether the said appellees, in right of *Elizabeth* the wife, are entitled to share in the distribution of the estate? She claims to be the half-sister of the intestate, by a former marriage of *Giles L. Copes*, the father, and by the answer of defendant, not admitting or denying it, is put upon the proof of the fact. *Sarah A. Copes*, the last wife and widow of *Giles* is produced, and says: "That she often heard *Giles* speak of being married to *Mrs. Pearce's* mother, as his first wife, and of the children of that marriage, of whom *Betsy* was the youngest of three; and that he was married in *Accomac* county, *Virginia*. That his first wife died, after three or four years, and he married the second, with whom he lived between twenty and thirty years;" and she speaks of her-

self as the third. "*Giles* always called *Betsy Pearce* his daughter, always spoke of her as his daughter, and called her children, his grand-children." Other witnesses speak to the same, or similar declarations, by *Giles*, "that *Betsy* was the offspring of his first marriage, that she lived with *Giles* as his daughter before her marriage; and that all the brothers by the second marriage called her '*sister Betsy*,' and treated and recognized her as a sister."

Some evidence was produced designed to weaken the force of these declarations, by giving to *Mrs. Pearce* the relation of foster-child and sister, in the family. But it is purely argumentative, and in no view can be considered as impeaching, contradicting, or weakening, the testimony of the other witnesses.

At first view we should have held these declarations as amply sufficient to establish the legitimacy of the claim of *Elizabeth Pearce*, but that it is strenuously insisted by counsel: "that co-habitation must be first shown, to raise the inference of marriage; and that the authorities do not sanction the admission of declarations to prove, *per se*, not only the issue, but the marriage." We have examined the cases cited for this doctrine, and can come to no such conclusion. *Buller's N. P.*, 294, 112. 4 *Camp. N. P. C.*, 401. *Cowper*, 593. Co-habitation alone, proved between parties as man and wife, is sufficient to raise the presumption of legal marriage, when the parties have been long dead. 2 *Ph. Ev.*, 286. It may not be possible, from the nature of the case, to supply additional proof. If there are any declarations of the parties besides, as to their being or not being married, these are afterwards to be used, to strengthen or weaken the presumption arising from their co-habitation. This is the meaning conveyed by *Buller* and by *Philips*. The claim of legitimacy will be found to be based upon co-habitation, as the first proof offered, not the first required. *See* the case in *Buller N. P.*, page 112, and *Wilson vs. Mitchell*, 3 *Camp.*, 393; *coverture being the defence set up in the case* And the *Berkeley* peerage, case warrants no such doctrine, as it was cited to sustain. *Lord Mansfield*, (page 415,) expressly says: "In matters of pedigree, it being

impossible to prove by living witnesses, the relationship of past generations, the declarations of deceased members of the family are admitted; from the necessity of the thing, the hearsay of the family as to marriage, births, and the like, are admitted." And he adds more, "that if the father is proved to have brought up the party as his legitimate child, this amounts to a daily assertion that the son is legitimate." Here is authority sufficient to sustain the pretensions of *Mrs. Pearce.* Any other, would in fact be to repudiate the rule which admits these declarations, as the best, and in some cases, the only evidence, the nature of the case admits of. It is upon this ground of necessity, that they are admitted as an exception to the general rule in relation to hearsay evidence; cases of pedigree being often incapable of direct proof, and depending entirely upon reputation.

The rule which emphatically embraces this case, is distinctly laid down in all the elementary writers on evidence, without any such qualification as is contended for.

" The declarations of a deceased person, as to the fact of his marriage, or to prove that a child was born before or after marriage, are admissible in evidence on a question of pedigree;" and even "the declarations of deceased members of the family, whether relations or connections by marriage, are admissible evidence to prove relationships, deaths or marriages." 2 *Ph. Ev.*, 284, 287. " The term pedigree embraces, not only descent and relationship, but also the facts of birth, marriages and death, and the times when these events happen." *Greenl. Ev.*, 117.—*See,* also, page 116. And it is therefore clear, that these authorities fully sanction the admission of the declarations of the answer, to prove, *per se,* not only the issue but the marriage.

The declarations of *Giles Copes* are full and explicit, with regard to his marriage, and the birth of *Elizabeth,* the appellee; and his whole subsequent conduct, and the course and bearing of the brothers, is an entire corroboration of them. Nothing short of actual proof of marriage and birth, by witnesses actually present, could be more convincing and conclusive; and we therefore affirm the right of the appellees to a distributive share of the personal estate of the intestate.

The necessity of a thorough examination of the voluminous testimony, has extended the opinion in this case, beyond the limits we desired to prescribe to ourselves. We confine ourselves, therefore, to a single remark, upon the influence sought to be produced upon the decision of the court by the production of the bible of *Giles Copes*, omitting in the family record the names of his children by this alleged first marriage, while it records the second, and the issue derived from that union. It has been satisfactorily proved by *Sarah*, his widow, that there was in the family of *Giles*, another bible, which is in the possession of the appellant; and this, of itself, might suffice to negative the inference, for which only the *one* is introduced. But this intended negative pregnant, cannot be brought to weigh against the repeated, unimpeached declarations in evidence, in the affirmative. What the bible contains is evidence of his declarations, as if written in any other book, or upon any other piece of paper. What it does not contain, cannot be used by inference, to falsify his uniform declarations on other occasions. If the proof were doubtful, or defective, the inference here sought might have some weight. But to give it any importance, under the existing state of the proof, would be to denounce all that *Giles Copes* has declared; and reject the competent and sufficient evidence that establishes the right of the appellees, to claim in this cause. The decree of the court below, is therefore affirmed.

DECREE AFFIRMED.