PHILIP EARL LEESON, JR. *v.* STATE OF MARYLAND

[No. 69, September Term, 1981.]

*Decided May 13, 1982.*

The cause was argued before MURPHY, C. J., and SMITH, DIGGES, ELDRIDGE, COLE, DAVIDSON and RODOWSKY, JJ.

*Gary W. Christopher, Assistant Public Defender,* with whom was *Alan H. Murrell, Public Defender,* on the brief, for appellant.

*Michael A. Anselmi, Assistant Attorney General,* with whom was *Stephen H. Sachs, Attorney General,* on the brief, for appellee.

DAVIDSON, J., delivered the opinion of the Court.

This case presents the question whether it was reversible error for the trial court to exclude certain evidence proferred to show the petitioner's intent at the time of an alleged robbery on the ground that such evidence was irrelevant.

On 7 March 1980, in the Circuit Court for Harford County, the petitioner, Philip Earl Leeson, Jr., was charged with, among other things, robbery with a dangerous and deadly weapon, burglary, and malicious destruction of property.

At the trial, the State produced evidence to show that the petitioner had committed the crime of armed robbery. There was evidence to show that the petitioner and John Fred Byrd (accomplice) had forcibly entered the residence of Mr. and Mrs. Joseph Owsik at a time when only Mrs. Owsik and their children were at home. Moreover, there was evidence to show that both men were armed with guns, that they threatened Mrs. Owsik, and that she was very frightened.

There was also evidence to show that the petitioner and the accomplice removed three television sets, a tape player, a tape recorder, and other personal property.

In addition, the State introduced into evidence a statement that the petitioner had given to the police on the day of his arrest. In the statement, the petitioner admitted that he and the accomplice forcibly entered the Owsiks' residence, but denied that either of them was armed. The petitioner further said that Bernard Walker, a former associate of Mr. Owsik, "had planned . . . the robbery." Walker told the petitioner that there were papers in a black box in the Owsiks' house that would implicate Mr. Owsik in the defrauding of a federally-funded program. Walker further told the petitioner that these papers could be utilized to blackmail Owsik. Walker gave the petitioner and the accomplice a sketch of the layout of the house, drove them to the house, directed them to retrieve the black box, and described other items of personal property that could be taken from the house.

At the close of the State's case, counsel for the petitioner proffered the testimony of the accomplice who testified out of the presence of the jury, as follows:

> "A. I was informed that *Mr. and Mrs. Owsik was wanting to get some of their valuables taken away* from somebody that they knew, which was the name of Bernie Walker. *And he [Walker] came down to me and Phil and told us these people wanted to be robbed in order for them to claim a whole lot of other things missing so they could claim some money* because Bernie was supposed to know him because he worked for Mr. Owsik or something like that. That is where Bernie knew him from.
>
> "And at first I wouldn't go along with it. But Bernie wanted and continued pushing the subject and convinced me he really did know these people. So, I think I then agreed with him and my Co-defendant, Phil Leeson to go along with him.

. . .

"Q. What was your understanding of the reason you were going into the Owsiks' residence?

"A. *My understanding was we was going in there to take some goods away from the house* into her car. . . . We was to go in there *and get a box of some sort and a whole bunch of money* which was a total of $5,000 Bernie was talking about. And according. to him, we was supposed to split everything down three ways and go about our business and *these people was to go ahead and collect the insurance on the valuables they claimed missing,* which they were supposed to claim a lot more missing than was took.

"Q. *Was it your understanding that the Owsiks knew you were coming into the house that night?*

"A. *Oh, yes.*

"Q. *Would you have gone into the house had you thought that the Owsiks were not part of this scheme?*

"A. *No.* I wouldn't have because at the time the idea was brought up to me, I was not that high. I was under the influence of drugs at the time, but I wasn't that high to not understand that. When he told me this, this is what brought on the whole idea of going in there. I figured if the people knew the whole idea about going in, we wouldn't be arrested because they would give a phony description of us and everything. And this is why me and Phil both agreed to do it because we knew we wasn't going to get caught for something like this." (Emphasis added.)

After an objection by the State on the ground of relevance, among other things, the trial court ruled as follows:

"Well, I think I would permit him to testify only to the effect that Bernie Walker asked them to do it, and told them they would not get into any trouble. But as to getting into *all this other stuff about some Owsik recovery of insurance has nothing to do with the issues in this case at all.*

. . .

*I don't want any stories about insurance fraud* or anything else coming out in this trial." (Emphasis added.)

Thus, the trial court ruled that the accomplice's proffered testimony concerning the alleged insurance fraud scheme was irrelevant and, therefore, inadmissible.

Thereafter, the accomplice testified before the jury. He admitted that at the direction of Walker, he and the petitioner had forcibly entered the Owsik residence and had removed various items of personal property including a briefcase containing papers. He denied that they were armed or that they threatened the victim in any way. He made no reference to the alleged insurance fraud scheme.

The petitioner then proffered the testimony of Walker. After being informed of his right against self-incrimination, Walker, out of the presence of the jury, denied that he had participated in any way in the commission of the crime, or that he discussed a possible burglary of the Owsik residence with either the petitioner or his accomplice. Although he additionally denied that he had talked to Owsik about a possible burglary of the Owsik residence, he admitted that Owsik mentioned such a possibility to him. He stated that Owsik was heavily in debt and had told him that he had enough insurance on some jewelry and appliance items to get himself out of immediate trouble. When defense counsel indicated that he wanted to call Walker to testify before the jury, the following took place:

"THE COURT . . . *I am not going to have any testimony with regard to* the mention of the jewelry or *any insurance recovery* on it.

. . .

I am going to limit it. He can answer the question whether or not he told these guys to do this thing, and that's it." (Emphasis added.)

Thus, the trial court ruled that Walker's proffered testimony

concerning the alleged insurance fraud scheme was irrelevant and, therefore, inadmissible. Thereafter, defense counsel indicated that in view of the trial court's ruling, the petitioner would not call Walker as a witness.

Finally, the petitioner took the stand in order to testify in his own behalf. After being asked why he went to the Owsik residence on the night of 12 April 1979, the following colloquy took place:

> "A.  There had been some arrangements made between myself and the Co-defendant and Mr. Walker, and to my knowledge—
>
> "MR. ROBINSON [State's Attorney]: Objection.
>
> . . .
>
> BENCH CONFERENCE.
>
> . . .
>
> "MR. TARRANT [defense counsel]: *He is going to say that Bernie Walker told him what Mr. Owsik said. And now this is going simply for what he [relied] upon [t]hat Bernie Walker told him."* [1]
>
> . . .
>
> It is showing his motivation. And *he was not intending to rob these people* or to burglarize their place. *He was intending to take part in an insurance fraud."* (Emphasis added.)

When the trial court ruled on the objection, the following colloquy took place:

> "THE COURT: Mr. Leeson, *you are not in any way to refer to anything with regard to the Owsiks, any arrangement you claim was made by them to*

---

**1.** The transcript of the testimony reads as follows:

"And now this is going simply for what he displayed upon what Bernie Walker told him."

*permit this thing to happen.* Any reference other than what you said in your statement with regard to Bernie Walker. And I believe in substance that was saying he wanted a box with a lot of money in it, saying he is the guy that requested you all do this.

. . .

"THE WITNESS: I don't feel how else or why else I am to explain to the jury of the results of what happened that night were, or how they could even understand as far as what was happening.

. . .

*I just don't understand how or why what my involvement with Mr. Owsik and the property that was taken, and the explanation to the people in the jury. I'm sure it would have a large bearing on whether they find me guilty on the charges or not.*

"I agree and know to a certain extent that I am guilty, but not what I am charged with. And I don't see how the jury could go about understanding if you are putting limitations. I don't know how else to express or tell them in words without being objected and overruled. I don't know how you want.

"THE COURT: I think you are caught in the rules of evidence Mr. Leeson. Bernie Walker comes in and denies everything.

. . .

*You are limited to only the explanation for why you went there. Here it is. Mr. Walker is a fellow that derived this whole plan to rob the house, from a box that was supposed to be there with important papers implicating the owner of the house in a fraud, and would have led him into blackmail. The information in the box was worth $5,000. And that is what you are limited to.*

. . .

"MR. TARRANT: But you are saying he can't say why Bernie Walker was involved or bring in the Owsiks?

"THE COURT: That's right.

"MR. TARRANT: *That really ruins the heart of our answer to these charges. He is saying he believed he was in on some sort of insurance scheme, but he—*

"THE COURT: *He didn't say that in the statement.*

"THE WITNESS: I told the police that, yes sir. *That was not in the statement. But that was the first thing that was told to the police.*

"THE COURT: You can't get into that. That is all I'm saying." (Emphasis added.)

Thus, the trial court ruled that the petitioner's proffered testimony concerning the alleged insurance fraud scheme was irrelevant and, therefore, inadmissible.

Thereafter, the petitioner testified before the jury. He admitted that at the direction of Walker, he and the accomplice had forcibly entered the Owsiks' residence and had removed various items of personal property including a black box. He denied that they were armed or that they had threatened Mrs. Owsik in any way. He made no reference to the alleged insurance fraud scheme. He testified that the statement he had given to the police was incomplete. Moreover, he denied that the statement was voluntary.

After the close of the petitioner's case, the trial court instructed the jury and closing arguments were presented. Counsel for the petitioner argued that the petitioner lacked the requisite intent. Thereafter, the jury found the petitioner guilty of robbery with a dangerous and deadly weapon, burglary, and malicious destruction of property.

The petitioner appealed to the Court of Special Appeals. That Court determined that the proffered testimony

concerning the alleged insurance fraud scheme was relevant to the crimes of burglary and malicious destruction of property because it tended to show that the petitioner believed that he was committing those crimes with the Owsiks' consent. Accordingly, in an unreported opinion, that Court reversed the petitioner's convictions of those crimes. *Leeson v. State,* No. 982, September Term, 1980, filed 24 April 1981.

However, with respect to the petitioner's conviction of robbery with a dangerous and deadly weapon, that Court said:

> "[A]s we stated earlier, the evidence sought to be introduced by Mr. Leeson tends to establish the inference that he believed the owner had consented to his commission of certain of the crimes charged. We say 'certain of the crimes charged' because we do not believe such testimony serves as a defense with regard to the offense of robbery with a deadly and dangerous weapon. There is evidence in the record sufficient to establish that Mr. Leeson, in furtherance of a scheme to blackmail Mr. Owsik, stole a box containing certain papers from the residence. Admittedly, this was not a consented-to act; thus there was no negation of an essential element of that crime." *Leeson,* slip op. at 4.

Accordingly, that Court affirmed the petitioner's conviction of robbery with a dangerous and deadly weapon.

The petitioner filed a petition for a writ of certiorari that we granted. We shall reverse the judgment of the Court of Special Appeals with respect to the petitioner's conviction of armed robbery.

In Maryland, the test of admissibility of evidence in a criminal case was recently reiterated in *Dorsey v. State,* 276 Md. 638, 350 A.2d 665 (1976). There, this Court said:

> "The real test of admissibility of evidence in a criminal case is 'the connection of the fact proved with the offense charged, as *evidence which has a natural tendency to establish the fact at issue.'*

[O]ur predecessors stated it to be 'an elementary rule that evidence, to be admissible, must be relevant to the issues and must tend either to establish or disprove them.' " *Dorsey,* 276 Md. at 643, 350 A.2d at 668-69 (citations omitted) (emphasis added).

*See, e.g., Pearson v. State,* 182 Md. 1, 13, 31 A.2d 624, 629 (1943); *Brooke v. Winters,* 39 Md. 505, 509 (1874). Evidence tending to show the intention and purpose of an accused ordinarily is relevant and, therefore, admissible. *Meyerson v. State,* 181 Md. 105, 109, 28 A.2d 833, 835 (1942); *Lamb v. State,* 66 Md. 285, 287, 7 A. 399, 400 (1886). It is error to exclude relevant evidence. *Haile v. Dinnis,* 184 Md. 144, 152, 40 A.2d 363, 367 (1944); *Nailor v. Bowie,* 3 Md. 251, 258 (1852).

Here the petitioner was convicted of robbery with a dangerous and deadly weapon. In *State v. Gover,* 267 Md. 602, 298 A.2d 378 (1973), this Court considered the question of the intent necessary for the commission of the crime of armed robbery. Initially, this Court, quoting from *Hadder v. State,* 238 Md. 341, 354, 209 A.2d 70, 77 (1965), defined robbery as follows:

" 'Robbery may be defined as the felonious taking and carrying away of the personal property of another from his person ... by the use of violence or by putting him in fear. The crime, however, is not committed unless there is an intention to deprive the owner permanently of his property or the property of another lawfully in his possession.' "

In addition, this Court said:

"It is clear that there can be no robbery without a larcenous intent. *Midgett v. State,* 216 Md. 26, 139 A.2d 209 (1958). Therefore, as larceny is an ingredient of robbery, we look to the components of the former to ascertain the requisite mental element of the latter. Larceny is the fraudulent taking and carrying away of a thing without claim of right with

the *intention of converting it to a use other than that of the owner without his consent. Brown v. State,* 236 Md. 505, 204 A.2d 532 (1964); *Fletcher v. State,* 231 Md. 190, 189 A.2d 641 (1963); *Putinski v. State,* 223 Md. 1, 161 A.2d 117 (1960)." *Gover,* 267 Md. at 606, 298 A.2d at 381 (emphasis in original).

Thus, this Court established that the requisite mental element of armed robbery is the intention to convert property without the owner's consent. Because in a trial for the crime of armed robbery intent is a fact at issue, evidence tending to show the accused's intent, as well as the owner's consent or lack of consent, is ordinarily relevant and admissible.

Here the record shows that the petitioner proffered evidence tending to establish that he lacked the intent necessary to commit armed robbery because at the time of the alleged armed robbery he intended to take the Owsiks' property with their consent. Initially, he proffered the testimony of Walker to the effect that Owsik had told Walker that Owsik was heavily in debt and had mentioned the possibility of a burglary of his home because he had enough insurance on certain items of personal property to get him out of trouble. The petitioner also proffered the testimony of the accomplice. That proffered testimony included statements that Walker told both the accomplice and the petitioner that Owsik wanted to be robbed as part of an insurance fraud scheme; that it was the accomplice's understanding that he and the petitioner were going to the Owsiks' residence for the purpose of removing various items of personal property, including a black box; that it was the accomplice's understanding that the Owsiks knew that he was coming; and that the accomplice would not have gone into the house if he had thought that the Owsiks were not part of the insurance fraud scheme. Finally, the petitioner proffered his own testimony to the effect that Walker told him what Mr. Owsik said; that he relied upon what Walker told him; that he believed he was participating in some sort of insurance scheme; and that he was not intending to rob the Owsiks but rather was intending to participate in an insurance fraud

scheme. All of the proffered testimony tends to establish that at the time of the alleged armed robbery, the petitioner intended to take the black box as well as the other items of personal property with the consent of the Owsiks.

The Court of Special Appeals found that all of the proffered testimony tended to establish that the petitioner understood that the Owsiks had consented to the commission of the crime of burglary and malicious destruction of property. It held all of the proffered testimony to be relevant and admissible with respect to those crimes. That Court, however, found that the same proffered testimony did not tend to establish that the owner had consented to the taking of the black box. Therefore, it, like the trial court, held all of the proffered testimony to be irrelevant and inadmissible with respect to the alleged crime of armed robbery. The sole reason offered to support this conclusion was that there was "evidence in the record sufficient to establish that [the petitioner], in furtherance of a scheme to blackmail Mr. Owsik, stole a box containing certain papers from the residence. Admittedly, this was not a consented-to act. . . ."

The record does contain sufficient evidence which, if believed, would establish that at the time of the alleged armed robbery, the petitioner intended to take the black box without the consent of the Owsiks. That evidence consists of the petitioner's statement to the police in which he indicated that his purpose in going to the Owsik residence was to take a black box containing papers that would enable Walker to blackmail Owsik. However, the record additionally shows that the petitioner subsequently testified that the statement was incomplete. He said that it omitted statements he had made to the police concerning the insurance fraud scheme. Moreover, the petitioner denied that the statement was voluntary. Under these circumstances, it is clear that the proffered testimony tended to contradict the petitioner's statement to the police and, more important, tended to establish that at the time of the alleged armed robbery, the petitioner was engaged in an insurance fraud scheme and intended to take personal property including the black box

with the consent of the Owsiks. Because the proffered testimony tended to establish the petitioner's intent and the Owsiks' consent, it was relevant and admissible. Both the trial court and the Court of Special Appeals erred. Accordingly, we shall reverse.

> *Judgment of the Court of Special Appeals with respect to the conviction of robbery with a dangerous and deadly weapon reversed.*
>
> *Case remanded to that Court with directions to reverse the judgment of the Circuit Court for Harford County and to remand the case to that Court for a new trial on all charges.*
>
> *Costs to be paid by Harford County.*