[No. A118208. First Dist., Div. Four. Sept. 29, 2009.]

THE PEOPLE, Plaintiff and Respondent, v.
TROY DEVIN SMITH, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

*Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts III.B. through III.F.

1480

**COUNSEL**

Hilda Ellen Scheib, under appointment by the Court of Appeal, for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gerald A. Engler, Assistant Attorney General, Stan Helfman and Jeffrey M. Laurence, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

RUVOLO, P. J.—

## I. INTRODUCTION

It was reported to be the largest jewelry heist in San Francisco history. Intruders entered a Union Square jewelry store while it was closed for the weekend, at a time when the store's safe room was being remodeled, and the store's security camera had exhausted its videotape and was not recording. A vacant restaurant space was located on the other side of the safe room's interior wall. The restaurant's exterior door had been rigged, by persons unknown, in a way that enabled the intruders to gain entry even though it was ostensibly locked. From the vacant restaurant, the intruders gained access to the jewelry store by cutting a hole through the common interior wall, in a location formerly occupied by a door. The hole led directly into the jewelry store's safe room. Ordinarily, the safes would have been located flush against the common wall, preventing the robbers from entering. But, on this particular weekend the safes had been moved temporarily into the middle of the room due to the remodeling.

Once inside the jewelry store, the intruders briefly set off a motion detector alarm in the safe room, but when the alarm company called the store owner, he took no action. The intruders were able to prevent further alarms by covering the motion detector with a cardboard box, using a ladder left in the safe room to reach it. They then concealed themselves until some employees arrived to open the premises on Monday. The intruders forced the employees to open the store's safes, and made off with almost $4.5 million worth of jewelry. Shortly after the robbery, the store's owner applied for and received a $4 million insurance payment for the loss.

At appellant's robbery trial, the prosecution's theory of the case was that the robbery was an "inside job," set up by the store's owner in order to collect on the insurance. Based on this theory, appellant contends that if indeed the store owner conspired with the robbers and gave them his permission to rob the jewelry store, the elements of the crime of robbery have not been established.

In a case of first impression in this state, we reject appellant's claim, holding that even if the owner of a retail store consents to the taking of the store's property by third persons, those persons still commit a robbery if they

take store property, by means of force or fear, from the custody of store employees who are unaware of the consent given to the robbers by their employer.

In the unpublished portions of our opinion, we reject appellant's challenges to the sufficiency of the evidence of his involvement in the robbery, and to his convictions for robbing the store's bookkeeper and sales assistant. We also reject his claims of prosecutorial misconduct and sentencing error. Finally, we explain that we cannot address appellant's claims of ineffective assistance of counsel on direct appeal, as the trial record does not permit us to determine whether or not appellant's trial counsel had tactical reasons for the decisions he made.

## II. FACTS AND PROCEDURAL BACKGROUND

Lang Antiques, which we will refer to as the jewelry store or the store, occupies a portion of the ground floor of a building in the Union Square area of downtown San Francisco. As of April 2003, the remaining portion of the building's ground floor (the restaurant space) was vacant. It had formerly housed a restaurant named Rumpus, which had gone out of business. The main entrance to the restaurant space was on Tillman Place, with another entrance on Campton Place.

The jewelry store had a showroom in the front; a back room (the safe room) separated from the showroom by a curtain; a bathroom adjoining the safe room; and offices upstairs. The safe room held three safes in which the store's inventory of jewelry was secured when the store was closed. The back wall of the safe room, against which the safes normally stood, was an interior wall of the overall building, and separated the safe room from a room in the vacant restaurant premises.

The jewelry store's security system included door alarms, panic buttons, and a motion detector in the safe room, all monitored by a private alarm company, plus a video surveillance camera in the safe room. In addition, the front entrance was protected by roll-down metal grating.

The jewelry store was open Monday through Saturday. On Saturday, April 5, 2003, at 5:30 p.m., salesperson Richard Frey closed the jewelry store and turned on the alarm system. Before leaving, he put a new tape into the video surveillance system. The tapes could only record for 24 hours, however, so even with a new tape inserted at closing time on Saturday, the surveillance system would stop recording about 5:30 p.m. on Sunday.

At the time Frey closed the store on April 5, 2003, the safe room was in the process of being remodeled under the supervision of the store's owner, Mark Zimmelman, and its manager, Suzanne Martinez. Because of the remodeling, the room was in some disarray; two of the safes had been moved from the back wall of the safe room to a side wall, and a third safe had been replaced with a different, larger safe from another location. In addition, a ladder had been left there.

At 11:16 p.m. on Sunday, April 6—after the video surveillance camera had stopped recording—a motion detector at the jewelry store, probably the one in the safe room, triggered an alarm. The alarm company alerted the police and then called Zimmelman. Zimmelman asked to be notified if the police found a problem, but did not take any further action. A police officer checked the exterior of the store and saw no problem; the exterior grate was down, no windows were broken, no alarm bells were ringing, and he did not observe anything amiss in the showroom when he looked through the windows with his flashlight. After about five minutes passed and no additional movement was detected, the alarm ceased. The police officer reported the premises secure, and no further action was taken.

The following morning, Monday, April 7, 2003, Frey returned to the jewelry store about 9:15 or 9:30 a.m. to open up. Standard security procedures required that there be two people present to open the store, so Frey met another store employee there, Erin Beeghly, a student who worked part time as a gemologist and sales assistant. Frey opened the store, went into the safe room to disable the alarm system, and then went upstairs to the office. Beeghly headed through the safe room and into the bathroom, intending to change her clothes.

When Beeghly opened the bathroom door, two tall African-American men with guns jumped out. They ordered her to the floor, and told her not to look at them. Frey heard Beeghly scream, and started down the stairs, only to encounter a man waiting at the bottom of the stairs with a gun pointed at him. The man was not wearing a mask, so Frey got a good look at his face. Frey described the man as African-American, about six feet tall, with a medium or light complexion, and a nose resembling that of football player Jerry Rice. Later, Frey was able to identify the man as Dino Smith, appellant's brother.[1] When shown a photographic lineup, Frey picked appellant's photograph, as well as Dino Smith's, as depicting possible suspects.

---

[1] In 2005, Dino Smith was convicted of participating in the robbery and sentenced to prison.

The man put the gun to Frey's back and directed him to enter the safe room, where Frey saw another man holding a gun pointed at Beeghly. The robbers told Frey not to look at them, and one of them directed him to open the safes. Frey had difficulty doing so, because he was very nervous. After Frey managed to get one of the safes open, the doorbell rang. Frey told the robbers that it could be Miranda Gonsalves, the bookkeeper, and the robbers directed him to go and let her in, and bring her to the safe room. Beeghly was kept in the safe room with the robbers as a hostage.

When Frey opened the door for Gonsalves, he told her quietly that they were being robbed, but she did not really grasp what he was saying, and started to head upstairs to work on the accounts. As Gonsalves neared the top of the stairs, Frey called to her, and a light-skinned African-American man emerged from the safe room, ran upstairs after her, pointed a gun at her, and ordered her into the safe room. There, a second man, who was darker skinned and seemed older, then directed her to face the back wall. The first man seemed to be wearing a mask, but he had pushed it up onto his forehead, so Gonsalves could see his face. Two years later, after seeing a news story about the robbery, Gonsalves identified the first man as George Turner.[2] Shortly after the robbery, Gonsalves picked appellant's photograph, as well as Dino Smith's, as depicting possible suspects from a photographic lineup, but she was not sure of these identifications.

Frey then resumed trying to open the safes. He was able to open the second one, but not the third, which was the one that had recently been moved into the jewelry store from a different location. As Frey was working on getting the third safe open, the doorbell rang again. It was Martinez, the store manager. Martinez had a key, but because she could not see any other store employees in the front room, she complied with the store's standard security procedures by ringing the doorbell rather than unlocking the front door herself.

Frey let Martinez in, quietly told her that a robbery was in progress and that Beeghly was being held hostage, and went back into the safe room with her. Frey tried again to open the third safe, but failed, so he asked Martinez to try, and she succeeded.

The intruders emptied the contents of the safes into large plastic bags. At the request of Frey and Martinez, they left behind some of the items in the safes that were not part of the store's inventory, but had been left by customers for repair or on consignment. Because the store kept very complete

---

[2] Turner was arrested in June 2003 with $650,000 worth of the jewelry store's inventory in his possession. He pleaded guilty to the robbery and was sentenced to prison.

inventory records, it was possible to determine precisely what had been taken. The final tally was 1,297 pieces of jewelry, with a value of almost $4.5 million.

Before leaving, the intruders bound the employees with plastic handcuffs and duct tape, and left them lying or sitting on the floor. While this was happening, Frey noticed for the first time that there was a large hole in the wall of the safe room, which had not been there when he left the store on Saturday. Gonsalves also noticed the hole at some point during the crime, though she could not recall exactly when. Frey and Gonsalves both looked through the hole and could see a figure moving around in the room on the other side of the wall. They could not see the person's face or even determine gender, however, because of their angle of view. Around this time, Gonsalves, Martinez, and Beeghly all heard a female voice that seemed to be coming from a walkie-talkie in the room on the other side of the hole. The voice sounded very professional, like a dispatcher, and seemed to be counting down time.

Finally, one of the intruders said, "Time's up, let's go," and they left through the hole in the wall. Martinez, who was the only one of the store employees who had been bound only with duct tape and not with handcuffs, was able to free her hands shortly thereafter, and then got scissors and freed the others. None of the employees was physically harmed, but all of them had been frightened while the crime was occurring. After freeing her coworkers, Martinez called another employee who was at the store's central office location and told that employee to call the police.

When the police arrived and investigated, they found that, as already indicated, the hole in the safe room wall led into the vacant restaurant premises. They also discovered that the hole had been drilled at a spot that constituted the weakest place in the wall dividing the store from the restaurant, because that part of the wall had formerly been occupied by a door with a glass panel in it.[3] Two people who had been in the restaurant space within a few days before the robbery—a prospective tenant and an electrician—confirmed that the hole had not been there when they last saw the wall.

The police investigation also revealed that the latch of the exterior door from Tillman Place into the restaurant space had been rigged with a wire so that it could be opened from the outside. The building owner had not seen this wire mechanism prior to the police investigation.

---

[3] About two years before the robbery, Zimmelman had expressed interest in leasing the restaurant space and, in that connection, the owner of the building had given Zimmelman the plans for the building as a whole.

The police also learned that a cardboard box had been taped over the motion detector in the safe room, and the jewelry store's phones had been disconnected. The motion detector was mounted high up in the safe room, but the intruders had apparently been able to reach it using the ladder that had been left in the room due to the remodeling. The police found a piece of poster board lying on the floor of the safe room that had a sticky spot on it; when the sticky spot was matched up with a rolled piece of duct tape that was stuck to the wall right above the hole, it appeared that the poster board had been used to cover up the hole. Later, both appellant's fingerprints and Turner's were found on that piece of poster board.

Appellant's fingerprint was also found on the sports section of a newspaper in the kitchen area of the restaurant space. Turner's fingerprints were on the front page of the same newspaper. The evidence at trial showed that the particular newspaper edition in question was available only from news racks in San Francisco starting sometime after 2:47 a.m. on Monday morning.

Although the jewelry store's security camera had stopped recording by the time the intruders entered the store, the police were able to obtain a video surveillance tape from an exterior camera belonging to a nearby department store, which happened to cover the Campton Place door to the restaurant space. The tape showed three people entering that door about 8:55 a.m. Monday morning, one of whom carried a newspaper, and four people leaving through the same door at 9:48 a.m. The tape was not clear enough to show the people's race or gender.

On April 25, 2003, about two weeks after the crime, two police officers went to appellant's apartment in Oakland with an arrest warrant. The building manager let the officers into the apartment, but it had been cleaned out and vacated. The only things left in the apartment were some cleaning supplies, a bag of puppy food, and a bathtub full of water that was still warm. As the officers were leaving, a security guard told them that someone was in the building's parking garage packing up some things. The officers went to the garage, where they found a man named Je Kim standing next to a car that had clothes packed into the trunk, and bags of personal belongings and cleaning supplies, as well as a small puppy, in the passenger compartment. Kim said the puppy was his. The items in the trunk of the car included a box of papers containing mail addressed to appellant.

When asked for his identification, Kim told the officers to look for it in the car's glove compartment. In the glove compartment, the officers found a pair of diamond earrings on a display stand, with a price tag attached. Kim told the officers that he had obtained the earrings in the apartment of Debbie Warner, who was the girlfriend of appellant's brother, Dino Smith. Martinez,

the jewelry store manager, later identified the earrings as part of the merchandise stolen during the crime.

Five days later, police searched Warner's apartment. In it they found the box of papers, including appellant's mail, that had been in the trunk of Kim's car. They also found appellant's wallet and driver's license. They did not, however, find any of the stolen jewelry.

The police arrested George Turner in June 2003, and later traced Dino Smith to New York, where he was arrested about a year after the crime. Appellant remained at large until March 2006, when he surrendered to the police in the company of his attorney.

On May 22, 2006, appellant was charged by information with four counts of second degree robbery (Pen. Code, § 212.5, subd. (c)),[4] each with an excessive taking allegation (§ 12022.6, subd. (a)(4)). Appellant was also charged with four counts of false imprisonment (§ 236), with an enhancement under section 12022.1, subdivision (a)(1); two counts of second degree burglary (§ 459); and one count of conspiracy to commit robbery (§ 182, subd. (a)(1)). All of the charges except the conspiracy count included an allegation that a principal in the crime was armed with a firearm. (§ 12022.1, subd. (a)(1).) The information alleged that appellant had prior serious felony convictions, including three "strikes" (§ 667, subds. (a), (d), (e); § 1170.12, subds. (b), (c)), and that he had served a prior prison term (§ 667.5, subd. (b)).

The jury at appellant's trial found him guilty on all counts, and found the gun use and excessive taking enhancement allegations true. Appellant waived jury trial as to the prior conviction allegations, and the court found them true.

On May 8, 2007, the trial court struck two of appellant's three "strike" priors, and sentenced appellant to 26 years in prison, which included upper term sentences on some of the counts. Appellant filed a timely notice of appeal on June 6, 2007.

### III. DISCUSSION

#### A. Robbery of Store with Owner's Consent in Owner's Absence

At appellant's trial, the prosecution advanced the theory that the crime was an "inside job" staged by Zimmelman in order to collect the insurance money

---

[4] All further statutory references are to the Penal Code unless otherwise noted.

on the stolen jewelry. On appeal, appellant contends that based on this theory of the case, his convictions for robbery must be reversed because, as a matter of law, one who takes property with the owner's consent does not commit a theft crime.

Respondent counters, in part, with the argument that even if Zimmelman consented to the taking of the jewelry store's property, that does not require reversal of appellant's robbery convictions because there was no evidence establishing that Zimmelman owned the jewelry store as a sole proprietorship rather than through a corporation or other business entity. This argument is inconsistent with the prosecution's position at trial. Moreover, the question whether Zimmelman had authority to consent to the taking of the store's inventory is a question of fact. (See generally *Snukal v. Flightways Manufacturing, Inc.* (2000) 23 Cal.4th 754, 779–787 [98 Cal.Rptr.2d 1, 3 P.3d 286] [discussing factual requisites for finding that corporate officer had authority to bind corporation to contract].) Such an argument cannot be raised for the first time on appeal. (*People v. Sakarias* (2000) 22 Cal.4th 596, 636 [94 Cal.Rptr.2d 17, 995 P.2d 152]; *People v. Flynn* (2000) 77 Cal.App.4th 766, 770–771 [91 Cal.Rptr.2d 902].) Accordingly, we evaluate appellant's legal challenge to the robbery verdicts assuming the facial validity of the prosecution's "inside job" theory.

Appellant argues that in order for a crime to constitute robbery or larceny, the perpetrator must intend to deprive the owner of the property permanently, *without the owner's consent*. For this proposition, appellant relies on *People v. Tufunga* (1999) 21 Cal.4th 935 [90 Cal.Rptr.2d 143, 987 P.2d 168] (*Tufunga*), and on six other California cases that examined the elements of robbery or larceny: *People v. Huggins* (2006) 38 Cal.4th 175, 214 [41 Cal.Rptr.3d 593, 131 P.3d 995], *People v. Davis* (1998) 19 Cal.4th 301, 305 [79 Cal.Rptr.2d 295, 965 P.2d 1165], *People v. Avery* (2002) 27 Cal.4th 49, 54 [115 Cal.Rptr.2d 403, 38 P.3d 1], *People v. Brock* (2006) 143 Cal.App.4th 1266, 1274 [49 Cal.Rptr.3d 879], *People v. MacArthur* (2006) 142 Cal.App.4th 275, 280 [47 Cal.Rptr.3d 736], and *People v. Edwards* (1925) 72 Cal.App. 102, 112 [236 P. 944], disapproved on other grounds in *In re Estrada* (1965) 63 Cal.2d 740, 748 [48 Cal.Rptr. 172, 408 P.2d 948]. Because the theory of the prosecution's case was that the owner was a participant in the crime, and thus gave his consent to the taking, appellant argues that the "felonious taking" element of robbery was not proved.

 None of these cases, however, involved the unusual fact situation here, i.e., someone using force or fear to take property from victims who had

possession, but not ownership, of that property, where the taker (unbeknownst to the victims) has the consent of the property's owner to take it. Cases are not authority for propositions not considered and decided in the court's opinion. (*Vasquez v. State of California* (2008) 45 Cal.4th 243, 254 [85 Cal.Rptr.3d 466, 195 P.3d 1049]; *People v. Avila* (2006) 38 Cal.4th 491 [43 Cal.Rptr.3d 1, 133 P.3d 1076].) Accordingly, statements in the cases on which appellant relies, to the effect that robbery or larceny requires the intent to steal, do not settle the question posed by appellant's argument in the present case.

Appellant also relies on four out-of-state cases that do deal specifically with the "inside job" or "staged robbery" situation presented in this appeal. (*Williams v. State* (Mo.Ct.App. 2003) 92 S.W.3d 348 (*Williams*); *Leeson v. State* (1982) 293 Md. 425 [445 A.2d 21]; *State v. Wright* (1935) 337 Mo. 441 [85 S.W.2d 7]; *People v. Goldberg* (1922) 302 Ill. 559 [135 N.E. 84].) As respondent points out, however, none of these cases reversed a conviction for robbery on the ground of consent in a situation in which the property owner who set up the alleged bogus robbery was not present at the time it occurred, and the actual victims of the force or fear used by the perpetrators were all unaware of the owner's consent to the taking of the property of which they had possession.[5] Thus, none of the out-of-state authorities is helpful, let alone persuasive, authority supporting appellant's legal contention.

Therefore, because this situation presents a question of first impression under California law, we begin with the language of the statute defining the crime of robbery. Section 211 provides: "Robbery is the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear." Case law has elaborated this definition further. "Robbery is essentially

---

[5] In *Williams, supra,* 92 S.W.3d 348, it appears that the owner of the robbed store was not present when the robbery occurred. Nonetheless, due to the procedural posture of the case, it does not stand for the proposition that there can be no robbery in an "inside job" situation even if the staged crime occurs in the absence of the consenting store owner. In *Williams,* the appellant had been convicted of the robbery of a jewelry store, despite his defense that the robbery was really a setup for the purpose of making an insurance claim. In the cited opinion, the court affirmed the denial of the appellant's motion for postconviction relief based on a claim of ineffective assistance of counsel. The appellant's position was that his trial counsel was ineffective in failing to request an instruction on the lesser included offense of theft. In rejecting this contention, the court stated that "[o]n the record here, either a gun was used to threaten and forcibly take jewelry from [the victim] without the consent of the owner, or the owner consented to a staged taking of the jewelry by [the appellant] and his cohort. . . . [E]ither a robbery occurred or [the appellant] was not guilty of the crime of stealing. [Citation.] This follows because *no* evidence was adduced that the participants took the jewelry *without* displaying or threatening the use of a deadly weapon. [Citation.] The . . . evidence only supported a verdict of guilty of first-degree robbery or not guilty based upon [the appellant's] 'consensual taking' defense." (*Id.* at pp. 350–351.) As the foregoing discussion demonstrates, the court in *Williams* had no occasion to consider, and did not decide, the issue presented here.

larceny aggravated by use of force or fear to facilitate the taking of property from the person or presence of the possessor. [Citation.] Robbery requires the specific intent to deprive the victim of his or her property permanently. [Citations.] The taking of the property of another is not theft absent this intent. [Citation.] . . . [¶] . . . ' "[A] bona fide belief of a right or claim to the property taken, even if mistaken, negates the element of felonious intent." ' " (*In re Albert A.* (1996) 47 Cal.App.4th 1004, 1007–1008 [55 Cal.Rptr.2d 217].)

■ As noted, appellant's argument is, essentially, that the property owner's consent in the "inside job" scenario negates one of the elements of robbery by rendering the taking nonfelonious. For guidance on this issue, we look to the California Supreme Court's examination of the meaning of the term "felonious taking." "[B]y use of the . . . term 'felonious taking' in section 211, the Legislature was . . . incorporating into the . . . statute the affirmative requirement, derived from the common law rule applicable to larceny and robbery, that the thief or robber has to intend to take property *belonging to someone other than himself* in order to be guilty of theft or robbery, that is to say, the common law recognition of the defense of claim of right." (*Tufunga, supra*, 21 Cal.4th at p. 947, italics added.) *Tufunga* held, on the basis of this reasoning, that a good faith claim of right to the ownership of specific property can negate the element of felonious taking that is necessary to establish theft or robbery.

This holding does not, however, necessarily imply that the taking involved in an "inside job" robbery is *not* felonious, and may, in fact, imply the opposite because it requires only that the property belong to someone other than the taker. The common law understanding of the "felonious taking" element of larceny and robbery, on which *Tufunga* relied, also includes the concept that "[a] person may be a victim of larceny even though he is not the owner [of the property taken]; he need only have a special property right, as in the case of a bailee or pledgee. It is enough that he has possession and that it is lawful as to the defendant, or that because of a legally recognized interest in the property he is entitled to possession as against the defendant. Moreover, the person from whom the property is taken qualifies as a victim of larceny even though he does not have the right of possession as against the true owner." (3 Wharton's Criminal Law (15th ed. 1995) § 381, pp. 454–456, fns. omitted.)[6]

---

[6] See also 18A California Jurisprudence Third (2001) Criminal Law: Crimes Against Property, section 127, pages 161–162, which states: "The law proscribes as larceny a taking from ownership or right of possession of any kind whatsoever, so long as it is in one other than the thief. . . . [¶] Considered as an element of larceny, 'ownership' and 'possession' may ordinarily be regarded as synonymous, for one who has the right of possession as against a

California has long followed the common law in this regard. For example, in *People v. Shuler* (1865) 28 Cal. 490, the defendant was charged with robbery. The indictment stated that the defendant had robbed a man named Wyckoff by forcibly taking from him some property that belonged to another man named Whiting. On appeal, the defendant argued that the indictment was defective in failing to plead that the property was taken from Whiting without the latter's consent. The California Supreme Court rejected this argument, reasoning as follows. "The indictment does state that from the person and control of Wyckoff, and against his will, the defendants did feloniously, forcibly and violently steal, take and carry away the money and property described. It thus appears that Wyckoff had possession of the property when it was taken, for it was taken from his person and control. Having possession of it, the law deems that possession rightful, and therefore the right of Wyckoff to the possession need not be stated in the indictment." (*Id.* at p. 493.) The court went on to explain that "an indictment for robbery must contain an allegation as to the ownership of the property of which the party named was robbed, or that it did not belong to the defendant[, but] '[i]t is not necessary that the property should belong to the party from whose possession it was forcibly taken.' " (*Id.* at p. 494.)

Similarly, in a case in which a man found some money on the street, and another man then stole it from him, the court rejected the thief's argument that he could not be convicted of grand theft because the finder of the money was not its owner. The court reasoned that "the finder of the lost money . . . had the right of possession, and was entitled to retain it as against all the world except the true owner . . . . Any legally recognizable interest is sufficient to sustain an averment of ownership in a charge of grand theft." (*People v. Beach* (1944) 62 Cal.App.2d 803, 806–807 [145 P.2d 685].)

■ In short, " ' "[c]onsidered as an element of larceny, 'ownership' and 'possession' may be regarded as synonymous terms; for one who has the right of possession as against the thief is, so far as the latter is concerned, the owner." [Citation.] It is, after all, a matter of no concern to a thief that legal title to the stolen property is not in the complainant. [Citation.] . . . "Possession alone, as against the wrongdoer, is a sufficient interest to justify an allegation and proof of ownership in a prosecution for larceny." ' " (*People v. Price* (1941) 46 Cal.App.2d 59, 61–62 [115 P.2d 225].)

■ This result comports with the gravamen of the crime of robbery. "Although classified in the Penal Code as a crime against the person, robbery is actually a crime against both the person and property. [Citation.] 'Robbery violates the social interest in the safety and security of the person

---

thief is, so far as the thief is concerned, the owner. Any legally recognizable interest is sufficient to sustain an averment of ownership in a charge of theft by larceny." (Fns. omitted.)

as well as the social interest in the protection of property rights.' " (*People v. Gomez* (2008) 43 Cal.4th 249, 264 [74 Cal.Rptr.3d 123, 179 P.3d 917].) "[T]he central element of the crime of robbery [is] the force or fear applied to the individual victim in order to deprive him of his property. Accordingly, if force or fear is applied to two victims in joint possession of property, two convictions of robbery are proper." (*People v. Ramos* (1982) 30 Cal.3d 553, 589 [180 Cal.Rptr. 266, 639 P.2d 908], fn. omitted, revd. on other grounds in *California v. Ramos* (1983) 463 U.S. 992 [77 L.Ed.2d 1171, 103 S.Ct. 3446].)

Reaffirming this rule, the California Supreme Court recently noted that "neither ownership nor physical possession is required to establish the element of possession for the purposes of the robbery statute. [Citations.] '[T]he theory of constructive possession has been used to expand the concept of possession to include employees and others as robbery victims.' [Citation.] Two or more persons may be in joint constructive possession of a single item of personal property, and multiple convictions of robbery are proper if force or fear is applied to multiple victims in joint possession of the property taken." (*People v. Scott* (2009) 45 Cal.4th 743, 749–750 [89 Cal.Rptr.3d 213, 200 P.3d 837].) As this discussion implies, it is the possession of property, not its ownership, which is the determining factor regarding whether a robbery has occurred. This principle makes sense, because the risk of injury or death resulting from confrontations between robbers and victims is not significantly reduced merely because the victims lack legal title to the property in their possession.

■ For all of the foregoing reasons, we hold that when the owner of a store consents to an "inside job" robbery that occurs while the store is under the control of employees who are unaware of the owner's plan, the owner's consent does not vitiate the "felonious taking" element of robbery. If the property that is taken was in the possession of the owner's innocent employees or agents, that is sufficient to make the taking felonious, even if the owner himself or herself is secretly in league with the perpetrators.[7]

## B.–F.[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

[7] This case does not present the question whether a robbery staged with the property owner's connivance is a "felonious taking" if the property owner is the only one present when it is committed, or if the purported victims are aware that the apparent robbery is feigned. Accordingly, we do not decide that question.

[*]See footnote, *ante*, page 1478.

## IV. Disposition

The judgment is affirmed.

Reardon, J., and Rivera, J., concurred.

Appellant's petition for review by the Supreme Court was denied January 13, 2010, S177800.