608 A.2d 1285

**Ethel WATSON**

v.

**STATE of Maryland.**

**No. 1616, Sept. Term, 1991.**

Court of Special Appeals of Maryland.

July 8, 1992.

Mark Colvin, Asst. Public Defender (Stephen E. Harris, Public Defender, on the brief), Baltimore, for appellant.

David P. Kennedy, Asst. Atty. Gen., Baltimore (J. Joseph Curran, Jr., Atty. Gen., and Joseph I. Cassily, State's Atty., for Harford County, Bel Air, on the brief), for appellee.

Argued before WENNER, FISCHER and DAVIS, JJ.

DAVIS, Judge.

The appellant, Ethel Watson, was originally convicted by a jury in the Circuit Court for Harford County on August 2, 1988 of first degree murder and sentenced to life imprisonment on January 31, 1989. On appeal, this Court, in an unpublished opinion filed on October 26, 1989, reversed the conviction and remanded the case for a new trial. Our reversal was subsequently affirmed by the Court of Appeals in *State v. Watson*, 321 Md. 47, 580 A.2d 1067 (1990). On remand, the appellant was again convicted of first degree murder and sentenced to life imprisonment. The appellant now seeks our review of the following issue:

> Did the trial court err in allowing the deceased's father to testify that she told him that a boy named "Robert" was the father of the child she was carrying?

## Facts

On September 13, 1987, the Harford County Police and ambulance crews were summoned to the Chase Manor Motel in Edgewood, Maryland. The call to which they responded was initiated by the appellant. When police and rescue units arrived at the appellant's motel room, they

discovered the cold, stiff body of the appellant's girlfriend, Jeannette Hill,[1] on the bed. She was dead.

Chandrika Patel, co-manager of the motel, testified that the appellant had checked into the motel between noon and 1:00 p.m. that day, and that she noticed nothing unusual that afternoon. Patel further testified that later in the day the appellant came to the office asking for change because his girlfriend was sick. Patel stated that while in the motel laundry room, she glanced across the parking lot, towards the appellant's room, and she saw the appellant and a black woman who was standing and leaning against a dresser. There were no signs of forced entry into the room.

An autopsy revealed that Hill's death was caused by manual strangulation accompanied by blunt force injury (*e.g.,* a blow or blows with a fist) to her abdomen. Hill was approximately six months pregnant at the time of the incident. The assistant medical examiner who performed the examination determined that the blows to her abdomen had killed the fetus approximately two hours before Hill's strangulation, and that Hill had been dead for approximately two hours before police arrived. The autopsy further revealed that Hill had a blood alcohol level of .09 percent and that there was a small amount of PCP in her system. Though there was blood under several of the fingernails on Hill's right hand, there were no marks on the appellant's face or hands.

The appellant was taken into custody. While at the police station, the appellant gave a written statement concerning what had occurred. In that statement, the appellant recounts that he picked up Hill at approximately 11:00 a.m. at her home in Washington, D.C., dropped off their son, who lived with the appellant, at the home of appellant's sister in Baltimore, and drove to Aberdeen. In Aberdeen, the appellant bought a pint of vodka, orange juice, and a six-pack of beer. At Hill's suggestion, they went to the motel where,

---

1. Ms. Hill was also known by the nickname Rose or Rosie.

after making love, the appellant fell asleep. Around 4:30 p.m., the appellant was awakened by the calls for help coming from Hill in the bathroom. The appellant stated that he ran to the bathroom and found Hill squatting in the shower. The appellant helped her to her feet, dried her off, helped her dress, and left to start the car. When he returned to the room, Hill was lying on the floor. He noticed that blood was coming from her mouth. After picking her up and placing her on the bed, the appellant stated that he attempted, unsuccessfully, to call "911" from the room telephone and ultimately used the pay telephone with change obtained from the motel office. The appellant does not say in his statement exactly how Hill died.

The State presented the testimony of Hill's father and the prior testimony of Hill's mother,[2] which established that Hill and the appellant had a long-standing sexual relationship. Hill's father further testified that, prior to her death, Hill had told him that "a boy named Robert" was the father of the unborn child she was carrying. Regarding this statement, the following colloquy took place:

[STATE]: Now, in September of 1987 what was Rosie's physical condition?

[WITNESS]: She was in good health. Like always. And always had been.

[STATE]: Was she expecting a baby in September of 1987?

[WITNESS]: She was pregnant at the time.

[STATE]: Now, did Rosie tell you who that baby's father was.

[DEFENSE]: Objection.

THE COURT: First off just yes or no?

[WITNESS]: Yes.

[STATE]: Who did she tell you that baby's father was.

[DEFENSE]: Objection.

THE COURT: Overruled. You may answer.

---

**2.** Hill's mother died after the first trial.

[WITNESS]: A boy named Robert.

The State argued that the appellant had a motive for committing the murder because he discovered that the child Hill was carrying was not his. The defense cross-examined Mr. Hill:

[DEFENSE]: And you indicate that you were told at some point that someone named Robert was the father of the child, isn't that right?

[STATE]: Objection. That was not for little Tony.

THE COURT: A different child.

[DEFENSE]: Who was Robert the father of?

[WITNESS]: He was the father of the unborn child.

[DEFENSE]: Well who was the father of the born child?

[WITNESS]: A boy by the name, Edward Drumgee (phonetic).

The appellant introduced a series of character witnesses who testified that, in their view, he was honest, truthful, peaceful, and dependable, and that they knew him to be a skilled and scrupulously honest automobile mechanic.

At the conclusion of all of the evidence, the jury convicted the appellant of first degree murder, battery, and assault; and the appellant was sentenced to life imprisonment for the murder.[3] The appellant now seeks our review of his conviction.

## Legal Analysis

### I

■ Hearsay is "an out-of-court assertion offered in court for the truth of the matter asserted, and thus resting for its value upon the credibility of the out-of-court asserter." *Cassidy v. State*, 74 Md.App. 1, 6, 536 A.2d 666 (1988). Exceptions, however, to the hearsay rule render certain statements admissible on the theory that the underlying circumstances contain inherent guarantees of trustworthi-

---

3. The appellant's convictions for assault and battery were merged into the murder conviction for sentencing purposes.

ness. An out-of-court statement, then, may be admitted either because it is not offered for the truth of the assertion or because it comes within one of the recognized exceptions to the rule. The statement that the victim made to her father prior to her death would properly have been admitted because it was not offered to prove that "a boy named Robert" was the father of her baby but rather to prove that appellant killed Jeannette Hill, driven by jealousy and rage because she had become pregnant by someone other than the appellant. The general rule is that such evidence is admissible if introduced for the purpose of showing that a party relied on or acted upon the statement and not for the purpose of showing that the facts stated in the declaration are true. *Shunk v. Walker*, 87 Md.App. 389, 401, 589 A.2d 1303 (1991), citing *Purvis v. State*, 27 Md.App. 713, 343 A.2d 898 (1975). *See also McCray v. State*, 84 Md.App. 513, 518, 581 A.2d 45 (1990).

In order for the statement to have been probative and relevant as to a reason or motive that the appellant had to kill the victim, it was incumbent upon the State to prove that the appellant knew or believed that "Robert" or someone other than the appellant was the father of the unborn child. The prosecutor argued that Hill's assailant inflicted blows deliberately to her abdomen. In her closing argument, she hypothesized:

Could it be that he wanted to kill the baby? Could it be that he was annoyed that someone had cut in on his herd of lovely ladies, that the victim was pregnant by another man? Would that have offended his male pride? These people had a child in common, a child who lived with the defendant. But paternity had not been established. Could it be they had a dispute over the child, she wanted him back? There are a lot of reasons the defendant could have why he wanted to eliminate Rose [referring to the victim].

Despite the argument of counsel speculating that the motivation for the appellant to pummel the pregnant victim in her abdomen was because of the possibility that she was

pregnant by a man other than himself, the only evidence offered in support of the argument is the hearsay statement made by the victim to her father about the paternity of her unborn child. Because the State failed to establish any knowledge, either circumstantially or by direct evidence, that the appellant knew of this statement, it is inadmissible for the purpose of showing that the appellant "relied on and acted upon the statement." *Shunk*, 87 Md.App. at 401, 589 A.2d 1303.

Although the colloquy between the court and counsel regarding the admission of the statement involved the proof of motive, the court's decision to admit the statement was based on the pedigree exception.

## II

In a conference in chambers, the prosecutor inquired as to whether she would be allowed to ask the victim's father "as to his understanding of who the father was of the child the victim was carrying at the time of her death." The lower court, citing *Rhoades v. Bussinger*, 188 Md. 638, 53 A.2d 419 (1947), and *Hendrickson v. Attick*, 136 Md. 1, 109 A. 468 (1920), determined that "[i]t would appear that a father speaking for a deceased, for the deceased daughter was the declarant would be allowed to state statements about her pedigree."

The pedigree exception is described in L. McLain, *Maryland Evidence*, § 804(4) at 477–78 (1987) (footnote omitted), as statements by a declarant, who has died or is otherwise unavailable, "concerning the declarant's own birth, adoption, marriage, divorce, legitimacy, ancestry, family relationship to others, or other similar facts of personal or family history or concerning such personal and family history of persons related to the declarant by blood, adoption, or marriage." *See also* C. McCormick, *Evidence*, § 322 at 901 (3d ed., 1984), and *Copes v. Pierce*, 7 Gill 247 (1848).

According to McLain, however, not all such declarations are admissible. "The declaration must have been made

*ante litem motam,* i.e., prior to any litigation or dispute regarding the matter, and at a time when there was no apparent motive to falsify." *Id.* at 478. The requirements, more specifically, to qualify as a pedigree exception to the hearsay rule are that

> [t]hese statements are admissible, however only upon a showing that the declarant is unavailable, that the statement was made before the origin of the controversy giving rise to the litigation in which the statement is offered (i.e., *ante litem motam* ) and that there was no apparent motive for the declarant to misrepresent the facts.... The general difficulty of obtaining other evidence of family matters, reflected in the unavailability requirement, furnishes impetus for the hearsay exception. Assurances of reliability are found in the probability that in the absence of any motive for lying, the discussions of relatives (and others intimately related to them) as to family members will be accurate.

McCormick, *supra,* at 902 (footnotes omitted).

Generally, statements of personal or family history are admitted because of the probability that the "natural effusions" of those who talk over family affairs when no special reason for bias or passion exist are fairly trustworthy. *State v. Hughes,* 120 Ariz. 120, 584 P.2d 584 (App.1978), citing 5 *Wigmore on Evidence* (3d ed.) § 1482 (1974).

Wigmore, discussing the underlying rationale as to trustworthiness, states:

> The circumstantial indication of trustworthiness ... has been found in the probability that the "natural effusions" (to use Lord Eldon's often-quoted phrase) of those who talk over family affairs when no special reason for bias or passion exists are fairly trustworthy, and should be given weight by judges and juries, as they are in the ordinary affairs of life.
>
>     *     *     *     *     *     *
>
> The opinion of the Judges is that the entry would be receivable in evidence, notwithstanding the professed

view with which it was made. Its particularity would be a strong circumstance of suspicion; but still it would be receivable, *whatever the credit might be to which it would be entitled.*

Finally, the offeror of the evidence must perhaps show the absence of motive to deceive, but slight evidence should suffice.

5 *Wigmore on Evidence,* §§ 1482–84 (1974) (footnote omitted) (emphasis added), citing *Anderson v. Walden,* 21 D.L.R.2d 279 (1960).

A review of the authorities that examine the pedigree exception to the hearsay rule indicates they are concerned with whether the challenged statement qualifies as an exception. In other words, the determination as to whether to admit the statement, *vel non,* is based upon its trustworthiness or reliability because of the "natural effusions of those who talk over family affairs where no special reason for bias or passion exists." *Wigmore,* § 1482. A review of the cases in which the pedigree exception has been invoked demonstrates that in every case the object was to establish a familial relationship which in and of itself resulted in the grant of some right or benefit to the person claiming under the exception.[4] It is the familial relationship which is central or critical to a resolution of the ultimate issue, in contrast to the case at bar where motive is the ultimate issue.

In the case *sub judice,* as we have observed in Part I, *supra,* the statement was not offered to prove that Robert

---

**4.** *See Hendrickson v. Attick,* 136 Md. 1, 109 A. 468 (1920) (executor was properly allowed to testify concerning statements made to him by the decedent about named legatees in the will); *Hutchinson v. Schneeberger,* 374 S.W.2d 483 (Ky.1964) (in prosecution for incest, child allowed to testify that the appellant was her father); *Johnson v. State,* 737 S.W.2d 901 (Tex.App.—Beaumont 1987) (officer's testimony that the appellant's sister had told him that the appellant was her brother was offered to prove the identity of the driver of the car); *Anderson v. Walden,* 21 D.L.R.2d 279 (1960) (support of infant; declaration of estranged wife, since deceased, that defendant was father of infant held inadmissible; emphasis upon interest to misrepresent facts).

was the father of Jeannette Hill's baby but rather to explain why the appellant committed the murder and to expound further upon his alleged jealousy at the prospect of his girl friend being pregnant by another man. The statement could just as well have involved an assertion that the victim had been dating another person or that the victim had incurred the wrath of the appellant in a myriad of other ways not even related to the sexual relationship between the two. It is pellucid that the only object of the prosecutor was to demonstrate the effect that the substance of the out-of-court statement of the victim to her father had upon the appellant. Accordingly, the lower court admitted into evidence a statement under the pedigree exception to the hearsay rule when, in fact, the statement was not offered to establish pedigree but rather to support the State's theory of the motive for the victim's murder.

### III

From the foregoing, the statement was not admissible under the pedigree exception to the hearsay rule. That the statement was not offered to establish pedigree was not raised by counsel or considered by the lower court. The reference to the chambers conference demonstrates that the pedigree exception was offered by the prosecutor as the basis for the admission of the statement and the lower court alluded to the decisions in *Rhoades* and *Hendrickson,* but the argument devolved upon the singular question of whether the hearsay exception should be applicable to the instant case. Ultimately, an objection was interposed when the statement was admitted through the testimony of the victim's father although none was made during the State's closing argument when the prosecutor referred to the statement. We must, however, for the purposes of this appeal, proceed on the basis that the court and counsel understood that the issue was the admissibility of the statement to prove motive, notwithstanding the fact that the prosecutor proffered the statement on the basis that it came within the pedigree exception to the hearsay rule.

Accordingly, although the lower court and counsel have failed to address the issue of whether the statement was properly admitted as a non-hearsay statement offered for the effect it had on Watson, we believe the lower court had the question squarely before it even though the waters were muddied by the injection of the pedigree exception issue into the case. Consequently, we are not prepared to find that the issue has been waived pursuant to Md.Rule 8–131(a). *See also Brecker v. State,* 304 Md. 36, 497 A.2d 479 (1985); *Thomas v. State,* 301 Md. 294, 483 A.2d 6 (1984); and *Wheeler v. State,* 88 Md.App. 512, 596 A.2d 78 (1991).

## IV

Our determination that the pedigree exception was not applicable to the facts in the case *sub judice* effectively disposes of several of the appellant's contentions. He posits that the pedigree exception "normally arises in civil cases" and that appellant's counsel "is not aware of any Maryland decisions which consider the applicability of the exception to a criminal case." He further asserts that the pedigree exception is bottomed on necessity by reason of the difficulty of obtaining evidence of family matters when the declarant is deceased (citing McCormick, *supra,* at 902); that the burden is upon the proponent of the exception thereby requiring the proponent to demonstrate the probable trustworthiness of the statement; and that the court is obliged to exclude the statement if there are independent circumstances indicating a lack of trustworthiness notwithstanding that the threshold requirements of a statement to come within the pedigree exception have been established. Finally, appellant, as we have noted, argues that the record is bereft of any direct or circumstantial evidence that Watson knew or believed that he was not the father of the child.

Because we hold that the pedigree exception is not applicable to the facts of the case before us, whether the exception is available in criminal cases, the burden of demonstrating trustworthiness, and whether the court is

obliged to exclude statements where independent circumstances showing that the statement is untrustworthy are all irrelevant to our discussion herein. Appellant's contention that the statement must be excluded "absent evidence that Watson knew or believed that Ms. Hill was pregnant by another man" gives us greater pause. The issue thus presented is simply one of materiality.

We said in *Blondes v. Hayes*, 29 Md.App. 663, 668, 350 A.2d 163 (1976), that

> [t]here are two possible grounds upon which objection to this evidence may have been based: materiality and/or relevancy. We will treat the objection as having raised both since these terms are often used interchangeably in the courtroom. *McCormick on Evidence*, (2nd ed.) at 434. McCormick further explains:
>
> > "If the evidence is offered to prove a proposition which is not a matter in issue or probative of a matter in issue, the evidence is properly said to be immaterial.
> >
> > . . . . .
> >
> > Relevancy, . . . is the tendency of the evidence to establish a material proposition.
> >
> > . . . . .
> >
> > . . . the most acceptable test of relevancy is the question, does the evidence offered render the desired inference *more probable than it would be without the evidence?*" at 434–437. [Emphasis in original.]

*See also Leeson v. State*, 293 Md. 425, 433–34, 445 A.2d 21 (1982); *Lomax v. Comptroller of Treasury*, 88 Md.App. 50, 591 A.2d 1311 (1991); *Myers v. Celetex Corp.*, 88 Md.App. 442, 594 A.2d 1248 (1991); *Best v. State*, 79 Md.App. 241, 259, 556 A.2d 701 (1989); and *Paige v. Manuzak*, 57 Md. App. 621, 622, 471 A.2d 758 (1984).

The question thus presented is whether the admission of the statement establishes a fact probative of a matter at issue, given the record before us. A review of the record discloses the fact that the victim and the appellant had sustained a long-standing romantic relationship; physical

evidence of a beating to the abdomen sustained by the victim; the fact of the victim's pregnancy; and the statement by the victim regarding the paternity of her unborn child. The statement was being offered to show appellant's motive to kill Jeannette Hill. For the statement to have any probative force, however, it was incumbent upon the State to demonstrate that the appellant's actions on the day in question were the result of the purported inflammatory statement. In the absence of any showing that he knew about the statement, the fact finder is required to bridge a chasm between the victim's statement and the appellant's actions. The result is that the statement fails to meet the test of materiality in that it is not probative of the matter at issue, *i.e.*, Watson was enraged by the statement. We hold that it was therefore error for the statement to be admitted.

Anticipating the State's argument, appellant, in his brief, claims that any error committed cannot be deemed harmless beyond a reasonable doubt. Citing the closing argument by the prosecutor, appellant concludes that "the evidence offered to show motive here has at least as much potential for prejudice as did the impeachment evidence admitted at Watson's first trial." We are not convinced beyond a reasonable doubt that the statement of the unborn child's paternity in no way influenced the verdict against appellant. *Hillard v. State,* 286 Md. 145, 154–55, 406 A.2d 415 (1979); *Dorsey v. State,* 276 Md. 638, 350 A.2d 665 (1976). Moreover, the burden of demonstrating that error is harmless is upon the State. *Hillard,* 286 Md. at 155, 406 A.2d 415; *Dorsey,* 276 Md. at 658, 350 A.2d 665. Hence, we are unable to view the error as harmless. We therefore hold that the admission of the statement concerning the paternity of the victim's unborn child constituted reversible error.

JUDGMENT REVERSED AND CASE REMANDED FOR A NEW TRIAL BY THE CIRCUIT COURT FOR HARFORD COUNTY.

COSTS TO BE PAID BY HARFORD COUNTY.