52 A.3d 995

**Daniel SHELTON**

v.

**STATE of Maryland.**

**No. 1240, Sept. Term, 2011.**

Court of Special Appeals of Maryland.

Sept. 5, 2012.

364

Anne K. Olesen (George Washington University Community Legal Clinics, Washington, DC), on the brief, for appellant.

James E. Williams (Douglas F. Gansler, Atty. Gen., on the brief) Baltimore, MD, for appellee.

Panel: EYLER, DEBORAH S., WRIGHT, and KEHOE, JJ.

WRIGHT, J.

On October 27, 2010, Daniel William Shelton, appellant, was arrested as a result of an undercover drug investigation. On November 18, 2010, Shelton was indicted in the Circuit Court for Montgomery County on one count of distributing a controlled dangerous substance, one count of conspiring to distribute a controlled dangerous substance, and one count of first-degree assault.

Shelton's jury trial began on February 16, 2011. At the close of the State's case on February 17, 2011, Shelton moved for a judgment of acquittal. The motion was denied. On February 18, 2011, the jury acquitted Shelton of the first-degree assault charge but found him guilty of the lesser-included second degree assault charge and the remaining distribution and conspiracy offenses. On June 22, 2011, the

trial court sentenced Shelton to eight years imprisonment for distribution of a controlled substance, eight years for conspiracy, and five years for second-degree assault, with all sentences to run concurrently. On July 5, 2011, Shelton timely filed this appeal.

## Questions Presented

Shelton presents two issues for our review, which we have rephrased as follows: [1]

I. Did the trial court err in admitting a hearsay statement under Maryland Rule 5–803(a)(5), the co-conspirator exception, because the statements of the accomplice were not made in furtherance of the conspiracy?

II. Did the trial court err in allowing the State, during its closing argument, to make statements that presented facts not in evidence and that misrepresented the State's relationship with a key witness?

For the reasons that follow, we affirm.

## Facts

On October 26, 2010, detectives from the Montgomery County Police Department's Tactical Narcotics Unit organized an undercover investigation, in which they sought to purchase crack cocaine from suspected drug dealers. Sergeant Charles Carafano tried to call a man named Scoop to set up the deal, but Sgt. Carafano reached a woman named Nicole Hosley instead. Hosley told Sgt. Carafano that although Scoop had been "locked up" and was unavailable, she would be willing to supply him with drugs. The two communicated back and

---

1. Shelton presented the issues as follows:

 I. Whether the trial court erred in admitting an alleged accomplice's hearsay statements under Maryland Rule 5–803(a)(5) when her casual statements to an undercover officer, which identified the supplier of the drugs, were not made in furtherance of the conspiracy.

 II. Whether the trial court erred when it permitted the State, during its closing argument, to argue facts not in evidence and to misrepresent how it had treated a key witness who had been convicted for his part in the underlying events of this case.

forth until they arranged to meet the next day at a grocery store in Rockville, Maryland.

On October 27, 2010, Sgt. Carafano arrived at the grocery store at 5:00 p.m. Hosley and a man named Darrin Duffin arrived shortly thereafter and entered Sgt. Carafano's truck. Once inside, Duffin made a brief telephone call. After hanging up, Duffin directed Sgt. Carafano to drive to the nearby Maryvale Market. At that point, Sgt. Carafano suspected that Duffin was not in possession of the drugs, and, when asked, Duffin confirmed that he did not have the drugs on him. As they drove to the market, Sgt. Carafano and Duffin discussed the details of their transaction. Duffin insisted that Sgt. Carafano pay for the drugs and then wait in the car while Duffin retrieved them. Sgt. Carafano indicated that he was uncomfortable with this arrangement, but, when Duffin again insisted, Sgt. Carafano agreed to pay in advance, if Duffin agreed to leave his wallet with Sgt. Carafano as collateral. After agreeing to this arrangement, Sgt. Carafano gave Duffin one hundred and sixty dollars in marked bills: a one hundred dollar bill and three twenty dollar bills all of which Sgt. Carafano had photocopied. Upon arriving at the market, Duffin left the car to meet with the drug supplier, and Hosley stayed in the car with Sgt. Carafano. While in the car, Hosley and Sgt. Carafano spoke, among other things, about Duffin's supplier, Hosley's decision to quit using cocaine, and Duffin's outfit.

A few minutes later, a white Jeep Cherokee pulled into the market's parking lot. Sgt. Carafano's view was partially obstructed by the Jeep, but he observed Shelton step out of the vehicle and begin interacting with Duffin. Duffin and Shelton entered the market where no officer could see or hear them. When they eventually emerged, Detective Timothy Spelman, who was assisting with the investigation, noticed that Duffin was carrying a small paper sack. None of the officers involved in the investigation witnessed the exchange between Shelton and Duffin. After the exchange, Duffin walked back to Sgt. Carafano's car. As Duffin got back into the car, Hosley got out of the car and began walking down the

street. Duffin produced a substance that, to Sgt. Carafano, appeared to be crack cocaine. Sgt. Carafano then gave the signal for the other detectives to make the arrest, and three detectives from a nearby van apprehended Duffin and Hosley.

By the time the officers arrested Duffin and Hosley, Shelton had already driven out of the parking lot. Detectives Fernando Jaramillo, Donnie Oaks, and Spelman followed Shelton's white Jeep while trying to maintain their cover. When Shelton realized that he was being followed, he attempted to evade the officers. Det. Oaks radioed for help and gave a description of both the driver and the vehicle he was driving.

Detectives Jaramillo and Spelman were located one block south of the market. They testified that, as the Jeep passed by, the driver looked over at Det. Jaramillo, who was sitting in his unmarked Chevrolet Trailblazer. Even though Det. Jaramillo was dressed in plain clothes, both Det. Jaramillo and Det. Spelman believed that the driver realized that Det. Jaramillo was a police officer. As the Jeep continued south, it passed the intersection where Det. Oaks was waiting in his unmarked Toyota 4Runner. Det. Oaks was wearing a police-marked vest, a neon arm band, and his police badge around his neck. He also wore a black jacket that covered his front so that it was not apparent that he was a police officer. As the driver of the Jeep passed Det. Oaks, he saw the driver look at him and believed that the driver had identified him as a police officer.

Det. Oaks testified that he began surreptitiously following the Jeep but did not attempt to stop it. Det. Jaramillo also pursued the Jeep, following several car lengths behind Det. Oaks. According to Det. Oaks, the driver continued operating the Jeep normally. After driving a short distance, Det. Oaks and Det. Jaramillo observed the Jeep turn left onto a narrow street, pass a "No Outlet" sign, and then pull over to the side of the road at an intersection.

Det. Oaks then attempted to apprehend the driver by pulling his 4Runner diagonally in front of the Jeep. Prior to exiting his vehicle, Det. Oaks removed his jacket so that his

police-marked vest, neon arm band, and police badge were visible. Det. Oaks advanced toward the Jeep with his gun drawn and yelled "police." Det. Oaks testified that he saw Shelton initially put his hands up, but then Shelton put the Jeep in gear and accelerated forward. Det. Oaks had to jump out of the way to avoid being hit. The Jeep clipped the front of the 4Runner and continued down a hill towards a circle at the end of the street.

Det. Oaks went back to his SUV while Det. Jaramillo pursued the Jeep towards the circle. After following the Jeep to the circle, Det. Jaramillo and Det. Oaks maneuvered their SUVs and blocked the Jeep between them. Det. Oaks testified that he opened his door and, while still partially inside, began shouting "police." According to the detectives, the Jeep then began moving in reverse, hitting the front of Det. Oaks's 4Runner.

The Jeep then began driving forward again and broke two wooden posts at the end of the circle. In an effort to prevent the Jeep from driving away, Det. Oaks drove his vehicle forward, colliding with the side of the Jeep. One of the wooden posts became lodged under Det. Oaks's 4Runner, disabling the vehicle. Det. Oaks exited his SUV and attempted to run beside the Jeep, which gained speed and pulled away when it reached the street running adjacent to the circle. Det. Jaramillo attempted to follow the Jeep through the posts, but he was unable to get through in time to continue the pursuit.

After the Jeep left the circle, Det. Oaks radioed for assistance and gave a description of both the Jeep and its driver. Sgt. Ronald Merritt, a patrol supervisor with the Rockville City Police Department, responded to the area and spotted Shelton walking down the sidewalk. Sgt. Merritt, who was in uniform and driving a marked police vehicle, pulled up next to Shelton and, from his car, commanded that Shelton get on the ground. Shelton was arrested without resistance. Officer Mark Broadus, a Rockville City Police Officer who assisted Sgt. Merritt, searched Shelton and seized a cellular phone and $132 in cash, but no drugs.

Corporal Troy Brenner examined the $132 found on Shelton, but the bills did not match the marked currency Sgt. Carafano had given Duffin. However, Cpl. Brenner found the three twenty dollar bills that Sgt. Carafano gave to Duffin in Duffin's possession. The one hundred dollars bill was never recovered. The detectives also examined both Shelton's and Duffin's phones to match the phone calls made during the investigation. From this, they were able to determine that Duffin had placed an earlier call to Shelton.

Additional facts will be provided in the discussion below as necessary.

## Discussion

### I. Admissibility of statements under the hearsay doctrine

While waiting for Duffin's supplier to arrive, Hosley and Sgt. Carafano had a conversation in which they discussed Duffin's outfit, how Hosley had quit using cocaine, Sgt. Carafano's purported drug habit, and Duffin's supplier. During this conversation, Hosley made several statements that tended to identify Shelton as Duffin's supplier. Specifically, Hosley stated that Duffin's supplier was a man named "Butch," and that he "was an average sized African–American man with short hair and light skin." She further stated that Duffin's supplier drove a white Jeep Cherokee and identified Shelton as Duffin's "contact" when Shelton arrived at the Maryvale Market.[2]

---

2. The State argues that Shelton did not preserve his claim of error regarding the admission of Hosley's statement identifying Shelton as Duffin's "contact" because Shelton failed to provide a citation to the official transcript in his brief. Instead, Shelton provided a citation to the wire recording from the State's trial exhibits. In addition, the State asserts that the time designation that Shelton provided does not correlate to Hosley's statement identifying Shelton as Duffin's supplier. A review of the wire transcript, however, reveals an exchange with Sgt. Carafano saying "that's probably him coming now," and Hosley responding later "yeah." The designation to the exhibit was sufficient for this Court to identify the statement at issue. Thus, we conclude that Shelton's claim as to Hosley's statement identifying Shelton as Duffin's contact was preserved for appellate review.

At trial, the State sought to introduce Hosley's statements; however, because Hosley was unavailable to testify, the State had to do so through the introduction of the wire recording as well as the testimony of Sgt. Carafano and Det. Spelman. Shelton's attorney objected to the admission of Hosley's statements on the grounds that they constituted hearsay. The State responded that the statements were admissible because they fell within the co-conspirator exception to the hearsay rule, Maryland Rule 5–803(a)(5). Shelton's attorney countered that the exception did not apply because Hosley's statements to Sgt. Carafano describing the supplier were not made in furtherance of the conspiracy. Rather, Shelton argued that Hosley's statements were mere idle chatter, which was not intended to advance the aims of the conspiracy. The circuit court allowed the State to introduce Hosley's statements contingent upon the State laying a proper foundation for the existence of a conspiracy.

On appeal, Shelton argues that the circuit court erred in admitting the statements Hosley made to Sgt. Carafano because Hosley's statements constituted hearsay, under Maryland Rule 5–801(c) [3], and did not fall within the co-conspirator exception to the hearsay rule, under Rule 5–803(a)(5) [4]. Shelton avers that the furtherance requirement in Rule 5–803(a)(5)

---

**3.** Maryland Rule 5–801 states:

> The following definitions apply under this Chapter:
> (a) **Statement.** A "statement" is (1) an oral or written assertion or (2) nonverbal conduct of a person, if it is intended by the person as an assertion.
> (b) **Declarant.** A "declarant" is a person who makes a statement.
> (c) **Hearsay.** "Hearsay" is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.

**4.** That section states:

> The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
> (a) **Statement by party-opponent.** A statement that is offered against a party and is . . .
> (5) A statement by a coconspirator of the party during the course and in furtherance of the conspiracy.

"is to be construed to protect the accused against the idle chatter of criminal partners and inadvertently misreported or deliberately fabricated evidence." 29A Am.Jur.2d *Evidence* § 856. Shelton further contends that the circuit court erred in concluding that Hosley's statements were admissible under Rule 5–803(a)(5) because they constituted mere idle chatter. Specifically, Shelton asserts that Hosley's statements were not intended to advance the aims of the conspiracy as evidenced by the fact that Hosley did not need to provide Sgt. Carafano with any assurances as he had already paid for the drugs, that Sgt. Carafano's questions did not relate to the transaction, and that Hosley only identified Duffin's supplier in response to Sgt. Carafano's questions, which Shelton argues indicates that Hosley did not view the information as being important to the objectives of the conspiracy.

The State responds that Hosley's statements were not hearsay because they were not offered for the truth of the matter asserted. The State further contends that even if the statements were hearsay, they were properly admitted under the co-conspirator exception to the hearsay rule. Specifically, the State asserts that the evidence presented at trial proves that Hosley and Shelton were involved in a conspiracy to distribute a controlled substance and that Hosley's statements to Sgt. Carafano were made in the course of the conspiracy and in furtherance of the conspiracy. Regarding the State's claim that Hosley's statements were in furtherance of the conspiracy, the State contends that Hosley intended to provide a contemporaneous description of events to assure Sgt. Carafano that everything was going as planned.

 In *Bernadyn v. State,* 390 Md. 1, 887 A.2d 602 (2005), the Court of Appeals reiterated the standard of review for appeals challenging a circuit court's ruling on the admissibility of hearsay evidence. There, the Court stated:

> We review rulings on the admissibility of evidence ordinarily on an abuse of discretion standard. *See Hopkins v. State,* 352 Md. 146, 158, 721 A.2d 231, 237 (1998). Review of the admissibility of evidence which is hearsay is different.

Hearsay, under our rules, *must* be excluded as evidence at trial, unless it falls within an exception to the hearsay rule excluding such evidence or is "permitted by applicable constitutional provisions or statutes." Md. Rule 5–802. Thus, a circuit court has no discretion to admit hearsay in the absence of a provision providing for its admissibility. Whether evidence is hearsay is an issue of law reviewed *de novo*.

*Bernadyn,* 390 Md. at 7–8, 887 A.2d 602 (emphasis in original). Because Shelton challenges the circuit court's ruling that Hosley's statements fall within the co-conspirator exception to the hearsay rule, we review the circuit court's ruling for legal error.

■ First, we conclude that Hosley's statements constitute hearsay, and therefore were inadmissible unless they fell within an exception to the hearsay rule. Pursuant to Maryland Rule 5–801(c), hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Rule 5–802 [5] requires that courts exclude hearsay statements unless "otherwise provided by [the Maryland Rules] or permitted by applicable constitutional provisions or statutes." *See also Bernadyn,* 390 Md. at 8, 887 A.2d 602 (stating that hearsay "must be excluded as evidence at trial, unless it falls within an exception to the hearsay rule . . . or is permitted by applicable constitutional provisions or statutes."). *See also Ashford v. State,* 147 Md.App. 1, 75, 807 A.2d 732 (2002); *Watson v. State,* 92 Md.App. 494, 500, 608 A.2d 1285 (1992). The State argues that Hosley's statements were not hearsay because they were not offered for the truth of the matter asserted; however, the State's contention is undermined by the fact that, during its closing argument, the State argued that Hosley's statements corroborated Duffin's testimony. Specifically, the State said:

---

5. Maryland Rule 5–802 states:
 Except as otherwise provided by these rules or permitted by applicable constitutional provisions or statutes, hearsay is not admissible.

And on that wire Nicole Hosley corroborates what Mr. Duffin told you. They were going to go to the Maryvale Market. She describes the white Jeep Cherokee that Mr. Duffin met up with, that Mr. Shelton drove there. Ms. Hosley confirmed the tags on that Cherokee, the handicapped tags, and I think the—in fact, the conversation from Carafano was, "is he handicapped?" and she says, "No, no, that's his girl's car." She said "the dealer is going to be almost 40, he's light-skinned," and then she said, "That's him, that's him, wearing the red shirt."

Second, we hold that, although Hosley's statements constituted hearsay, the circuit court correctly admitted them as they fell within the co-conspirator exception to the hearsay rule. Rule 5–803(a)(5) permits the introduction of a statement by a co-conspirator of a party even if the statement is hearsay where the co-conspirator made the statement "during the course and in furtherance of the conspiracy." Under this rule, "declarations of one conspirator, made during the pendency and in furtherance of the conspiratorial purpose, are admissible against the other co-conspirators." *Manuel v. State*, 85 Md.App. 1, 16, 581 A.2d 1287 (1990) (citations omitted). In *Manuel*, we further explained:

[A] conspirator is, in effect, the agent of each of the other co-conspirators during the life of the conspiracy. As such, any statement made or act done by him in furtherance of the general plan and during the life of the conspiracy is admissible against his associates and such declarations may be testified to by third parties as an exception to the hearsay rule.

*Id.* at 16, 608 A.2d 1285 (citation omitted). Thus, for the State to introduce Hosley's statements under the co-conspirator exception to the hearsay rule, the State must present evidence that the defendant and the declarant were part of a conspiracy, that the statement was made during the course of the conspiracy, and that the statement was made in furtherance of the conspiracy. *See United States v. Mason*, 658 F.2d 1263, 1269 (9th Cir.1981).

Our review of the record before the circuit court leads us to conclude that the State presented sufficient evidence that the court could reasonably find that Shelton, Hosley, and Duffin were engaged in a conspiracy to distribute a controlled dangerous substance. In *Walker v. State,* 144 Md.App. 505, 798 A.2d 1219 (2002), *rev'd on other grounds,* 373 Md. 360, 818 A.2d 1078 (2003), we reviewed the requirements to establish the existence of a criminal conspiracy. There, we stated as follows:

A criminal conspiracy consists of the combination of two or more persons to accomplish some unlawful purpose, or to accomplish a lawful purpose by unlawful means. The essence of a criminal conspiracy is an unlawful agreement. The agreement need not be formal or spoken, provided there is a meeting of the minds reflecting a unity of purpose and design. In Maryland, the crime is complete when the unlawful agreement is reached, and no overt act in furtherance of the agreement need be shown.

*Id.* at 542, 798 A.2d 1219 (quoting *Townes v. State,* 314 Md. 71, 75, 548 A.2d 832 (1988)). Here, the State presented evidence that Sgt. Carafano arranged to purchase crack cocaine from Hosley, that Sgt. Carafano met with Hosley and Duffin and drove with them to the Maryvale Market, that Sgt. Carafano gave Duffin $160, that Duffin met with Shelton at the Maryvale Market, and that, after meeting with Shelton, Duffin returned to Sgt. Carafano's vehicle and gave Sgt. Carafano crack cocaine. These facts sufficiently establish the existence of a conspiracy involving Shelton, Hosley, and Duffin.

Moreover, the facts set forth by the parties sufficiently establish that Hosley's statements were made during the course of the conspiracy. Specifically, the record indicates that Hosley made the statements at issue during a transaction for the sale of drugs. Additionally, at the end of the transaction, Hosley told Sgt. Carafano that he should contact her to purchase drugs in the future indicating an intent that the conspiracy continue beyond the transaction at issue. Furthermore, Shelton does not challenge the circuit court's ruling on the grounds that the statements were not made during the

course of the conspiracy; rather Shelton challenges the court's ruling on the grounds that the statements were not in furtherance of the conspiracy.

With respect to the furtherance requirement of Rule 5–803(a)(5), we conclude that Hosley's statements were in furtherance of the conspiracy because they assured Sgt. Carafano that the transaction was going as planned and were intended to assuage any concerns that Sgt. Carafano may have had about dealing with Duffin and Hosley. As we stated in *Walker*, 144 Md.App. at 542–43, 798 A.2d 1219, "the requirement that the statement be made in furtherance of the conspiracy is interpreted broadly." (Citation omitted). Thus, "[i]f some connection is established between the declaration and the conspiracy[,] then the declaration is taken as in furtherance of the conspiracy." *Irvin v. State*, 23 Md.App. 457, 472, 328 A.2d 329 (1974) (citation and emphasis omitted). Here, Hosley's statements regarding Duffin's supplier are directly related to the conspiracy, and therefore, under a broad reading of the requirement, would be in furtherance of the conspiracy.

A number of federal court decisions provide further guidance regarding the proper interpretation of the furtherance requirement through their construction of the analogous federal rule, Fed.R.Evid. 801(d)(2)(E). In *United States v. Warman*, 578 F.3d 320, 338 (6th Cir.2009), the Sixth Circuit stated that "[a] statement is in furtherance of a conspiracy if it is intended to promote the objectives of the conspiracy." (Citation omitted). Additionally, in *Mason*, 658 F.2d at 1270, and *North Carolina v. Collins*, 81 N.C.App. 346, 344 S.E.2d 310, 315 (1986), both the Ninth Circuit and the Court of Appeals of North Carolina concluded that statements of *reassurance* are in furtherance of a conspiracy. *See also United States v. Sandoval–Villalvazo*, 620 F.2d 744, 747 (9th Cir.1980); *Salazar v. United States*, 405 F.2d 74 (9th Cir.1968); *United States v. Valencia*, 609 F.2d 603, 632 (2nd Cir.1979). Moreover, in *United States v. Shores*, 33 F.3d 438 (4th Cir.1994), the Fourth Circuit stated:

A particular statement may be found to be in furtherance of the conspiracy even though it is susceptible of alternative interpretations and was not exclusively, or even primarily, made to further the conspiracy, so long as there is some reasonable basis for concluding that it was designed to further the conspiracy.

*Id.* at 444 (citations omitted). *See also United States v. Martinez–Medina,* 279 F.3d 105, 117 (1st Cir.2002) ("[A] statement need not be necessary or even important to the conspiracy, or even made to a co-conspirator, as long as it can be said to advance the goals of the conspiracy in some way.") (Citation omitted). In *Warman,* 578 F.3d at 338, the Sixth Circuit provided the following examples of statements that it has found to be in furtherance of a conspiracy:

where they identify other co-conspirators and their roles, apprise other coconspirators of the status of the conspiracy, or *indicate the source or purchaser of controlled substances.*

(Citation omitted and emphasis added).

Here, Hosley's statements were intended to reassure Sgt. Carafano that the transaction was proceeding as planned. When Sgt. Carafano first met Duffin and Hosley, he was hesitant to give Duffin his money before Duffin had the drugs. Sgt. Carafano told Duffin and Hosley that, because he had never dealt with them before, he did not know if they would steal his money. Only once Duffin offered to leave his wallet as collateral did Sgt. Carafano agree to give Duffin his money before Duffin had the drugs. From this, the circuit court could reasonably determine that Duffin and Hosley were aware that Sgt. Carafano did not entirely trust them. Furthermore, while they were waiting for Duffin's supplier to arrive, Sgt. Carafano expressed concern that the transaction was taking longer than he had expected. Finally, just before Duffin returned with the drugs, Hosley told Sgt. Carafano that he should give her a call if he wanted to purchase more drugs. In this context, the circuit court could reasonably conclude that Hosley's statements about the transaction and about Shelton were intended to build trust and assuage Sgt.

Carafano's concerns about dealing with her so that Sgt. Carafano would feel comfortable buying drugs from her in the future. Hosley's statements advanced the objective of the conspiracy, selling drugs, and therefore, were in furtherance of the conspiracy.

The facts of Shelton's case are similar to those in *Walker* and *Collins* where this Court and the Court of Appeals of North Carolina, respectively, concluded that certain statements made during a drug transaction were in furtherance of the conspiracy. In *Walker*, the defendant challenged the admissibility of a statement by an individual named Myrick, who had sold drugs to an undercover officer, identifying his supplier as the person waiting behind the restaurant where Myrick worked. *Walker*, 144 Md.App. at 510, 798 A.2d 1219. There, this Court stated, "[u]nder the broad rule set forth in *Irvin*, we see no error in the court's determination that the statement, 'My supplier is out back,' had enough connection to the conspiracy to warrant its admission." *Id.* at 543, 798 A.2d 1219. In *Collins*, an undercover officer arranged to meet a dealer at a fast-food restaurant to purchase cocaine. *Collins*, 344 S.E.2d at 314. The dealer told the officer that he would have to give her the money before she would get the drugs, but the dealer agreed to leave an associate with the undercover officer. *Id.* The dealer did not return, and while they were waiting, the dealer's associate made several statements that he had worked with the dealer before and that he could be trusted. *Id.* There, the Court of Appeals of North Carolina ruled that the associate's statements were admissible because they were intended to reassure the undercover officer that the dealer would return with the drugs. *Id.* at 315. In both cases, the officer had already paid for the drugs before the co-conspirator made the statements at issue.

Here, as in *Walker* and *Collins*, the statements at issue both identify the supplier and reassure the buyer that the transaction is going as planned. Moreover, in all three cases the statements were made after the buyer had paid for the drugs. Therefore, Shelton's argument that Hosley's statements did

not advance the conspiracy because Sgt. Carafano had already paid is unpersuasive.

Moreover, Shelton's case is distinguishable from other cases where courts have concluded that the statements at issue constituted mere idle chatter. In *United States v. Darwich*, 337 F.3d 645, 657–58 (6th Cir.2003), the Sixth Circuit concluded that statements made by a co-conspirator were inadmissible because they constituted casual conversation about past events, which was not in furtherance of the conspiracy. There, the defendant was convicted of selling marijuana out of a market he owned and operated. *Id.* at 650. A regular customer of his testified that he had purchased marijuana from the defendant and that the defendant sold approximately a pound of marijuana each day. *Id.* at 651. The customer stated that he could estimate the amount of marijuana that the defendant sold because the customer's nephews, who packaged marijuana for the defendant, would occasionally tell him how much marijuana they had packaged when he would pick them up. *Id.* The court determined that the statements made by the customer's nephews were not admissible under the co-conspirator exception to the hearsay rule because they constituted mere idle chatter. *Id.* at 657. In *United States v. Urbanik*, 801 F.2d 692, 698 (4th Cir.1986), the Fourth Circuit similarly concluded that a co-conspirator's statements identifying the defendant as his supplier made while lifting weights with a friend was not in furtherance of the conspiracy. There, the court concluded that the co-conspirator's statement was no more than a casual aside to the discussion of the defendant's weight-lifting abilities. *Id.*

Shelton's case differs from *Darwich* and *Urbanik* because in Shelton's case, the co-conspirator's statement was directed at a customer during a transaction for the sale of drugs, whereas in both *Darwich* and *Urbanik*, the co-conspirator's statements were directed at a friend or family member during casual conversation. In neither *Darwich* nor *Urbanik* were the co-conspirators trying to sell drugs when they made the statements at issue. Nor was there any indication that they were trying to obtain new customers. However, here, Hosley's

statements could reasonably be understood as furthering the conspiracy because they were made to a customer, during a transaction, and with an eye towards future sales.

## II. Appropriate Scope of the Appellee's Closing Argument

Prior to Shelton's trial, Duffin accepted a plea agreement which provided for a maximum sentence of 18–months in prison for his involvement in the transaction with Sgt. Carafano. The agreement did not require that he testify against Shelton. When the State initially approached Duffin about testifying against Shelton, Duffin refused to do so. The State then issued a subpoena requiring that Duffin testify at Shelton's trial. When Duffin asked the prosecutor what would happen if he refused to testify, the prosecutor told Duffin that "[t]he Judge [would] hold [him] in contempt and [his Pre–Release Center] status [would] be suspended and [he would] go back to jail."

At trial, the State requested that the defense be prevented from exploring the details of Duffin's plea agreement. The State argued that the plea agreement did not require that Duffin testify and that the prosecutor's statement to Duffin in response to his question about the consequences of refusing to testify did not constitute a threat, promise, or inducement to obtain Duffin's testimony. However, the trial court ruled that the defense had a right to question Duffin about any perceived threat or agreement for his testimony.

Duffin testified that, after accompanying Hosley to the Giant grocery store and discussing the transaction with Sgt. Carafano, he met with Shelton at the Maryvale Market so that he could purchase the cocaine that he intended to sell. Duffin further testified that he purchased a beer in the market and placed the money in the bag, which he gave to Shelton. In return, Shelton handed him a baggie filled with crack cocaine, which he gave to Sgt. Carafano. On cross-examination, Duffin testified that his plea agreement set his maximum sentence at 18–months in prison instead of a possible 20–year sentence. Duffin further testified that while his plea agreement did not

require that he testify against Shelton, he believed that if he did not testify, he would be sent back to jail. Specifically, Duffin testified as follows:

[Defense Counsel]: And when the State approached you about testifying in this case, did you tell them that were [sic] not going to testifying [sic]?

[Duffin]: She know that I haven't anything to say to them.

[Defense Counsel]: And what were you told in response?

[Duffin]: They'd subpoena me, which they did.

[Defense Counsel]: Any if you refuse to testify?

[Duffin]: The Judge is going to hold me in contempt and [Pre–Release Center] status will be suspended and I will go back to jail.

＊　　＊　　＊

[Defense Counsel]: You believe that if you did not testify, that you would go back to jail?

[Duffin]: Yes.

During the State's closing argument, the following transpired:

[PROSECUTOR]: "... [W]hatever sentence Mr. Duffin received doesn't matter. The question is, did Mr. Duffin receive some type of deal to testify? And he told you, and you can see on the plea agreement that was entered into evidence, he pled guilty in December. He wasn't, he wasn't notified that he was going to testify. The first he ever heard about him needing to testify was two weeks ago when he was served ... with a subpoena to be here in court today.

He had no idea, when he entered that plea agreement, that he was going to be asked to testify. And, in fact, he told you that when he was served ... the first words out of his mouth were "I'm not testifying, I'm not going to do that." And he asked what would happen if, if he didn't testify, and he was told as a matter of fact, "[y]ou'd be held in contempt of court," and ladies and gentlemen, that's what would happen to any witness, not just Mr. Duffin—

[DEFENSE COUNSEL]: Objection.

[THE COURT]: Overruled.

[PROSECUTOR]:—if he refused to testify. He received no special treatment.

Shelton argues that the prosecutor's statements during closing argument were improper because they invited the jury to draw inferences from facts not in evidence and mischaracterized the testimony of a key witness. Specifically, Shelton asserts that the court erred when it permitted the prosecutor to tell the jury that she had only subpoenaed Duffin two weeks before the trial because Duffin never testified as to the date he received the subpoena. Shelton further contends that the prosecutor's statement harmed him because it bolstered Duffin's credibility and undermined Shelton's theory that Duffin had been induced or threatened to testify. Additionally, Shelton avers that the prosecutor mischaracterized Duffin's testimony about what the prosecutor told him would happen if he did not testify. Specifically, Shelton asserts that the prosecutor stated that she told Duffin that the court would hold him in contempt if he did not testify, but she failed to mention that she also told Duffin that his pre-release status would be revoked, and he would be sent back to jail. Shelton argues that the prosecutor's omission is significant because the omitted language demonstrates that Duffin was in a uniquely vulnerable position to threats of being held in contempt of court.

The State responds that Shelton failed to object to the prosecutor's statement that Duffin only learned two weeks prior to trial that he would be required to testify, and therefore, failed to preserve the issue for review on appeal. The State further argues that, even if preserved, the prosecutor's statements during her closing argument were proper, and thus, the circuit court did not abuse its discretion when it overruled Shelton's objection. Finally, the State contends that even if the prosecutor's statements were improper, reversal is not warranted because the statements were isolated, they lacked severity, and the circuit court properly instructed the jury that arguments by counsel were not evidence.

First, we agree that Shelton did not preserve his claim of error regarding the prosecutor's first statement when he failed to make a timely objection during closing argument. Maryland Rule 8–131(a) provides that, except for issues of subject matter and personal jurisdiction, "the appellate court will not decide any other issue unless it plainly appears by the record to have been raised in or decided by the trial court." We have repeatedly held that pursuant to Rule 8–131(a), a defendant must object during closing argument to a prosecutor's improper statements to preserve the issue for appeal. *See Icgoren v. State*, 103 Md.App. 407, 442, 653 A.2d 972 (1995) (holding that the defendant failed to preserve for appeal his claim that the prosecutor made improper statements during closing argument where the defendant did not object to the prosecutor's statements at trial); *Purohit v. State*, 99 Md.App. 566, 586, 638 A.2d 1206 (1994) (holding that the defendant did not preserve for appeal his claim that the prosecutor made improper statements as to the first of two remarks because the defendant failed to object to that portion of the State's closing argument). Therefore, because Shelton did not object when the State told the jury that it sent the subpoena to Duffin only two weeks before trial, Shelton cannot argue that the statement was improper on appeal.

As to the second statement, we review the circuit court's decision to overrule Shelton's objection for an abuse of discretion. In *Wilhelm v. State*, 272 Md. 404, 326 A.2d 707 (1974), the Court of Appeals addressed the scope of closing arguments as follows:

> As to summation, it is, as a general rule, within the range of legitimate argument for counsel to state and discuss the evidence and all reasonable and legitimate inferences which may be drawn from the facts in evidence; and such comment or argument is afforded a wide range. Counsel is free to use the testimony most favorable to his side of the argument to the jury, and the evidence may be examined, collated, sifted and treated in his own way.... Generally, counsel has the right to make any comment or argument

that is warranted by the evidence proved or inference therefrom....

*Id.* at 412, 326 A.2d 707. (Citations omitted). Although the courts give counsel broad discretion in the scope of their closing arguments, such discretion is not limitless. *See Wilhelm, id.* at 413, 326 A.2d 707 (stating that it is improper for counsel "to state and comment upon facts not in evidence or to state what he could have proven."). However, as the Court of Appeals stated in *Degren v. State,* 352 Md. 400, 430–31, 722 A.2d 887 (1999), "[n]ot every improper remark ... necessarily mandates reversal, and what exceeds the limits of permissible comment depends on the facts in each case." (Citations omitted). Thus, the "determination of whether the prosecutor's comments were prejudicial or simply rhetorical flourish lies within the sound discretion of the trial court." *Id.* (Citations omitted). Furthermore, "the trial judge is in the best position to gauge the propriety of closing argument in light of the facts of the case." *Mitchell v. State,* 408 Md. 368, 380–81, 969 A.2d 989 (2009).

██ We conclude that the prosecutor's statements were proper, and therefore, the court did not abuse its discretion in overruling Shelton's objection, because the prosecutor did not mischaracterize Duffin's testimony when she stated that Duffin would have been held in contempt of court like any other witness if he refused to testify. Shelton admits that "any witness may ... be held in contempt of court for failure to testify;" however, according to Shelton, Duffin was particularly susceptible to pressure from the State because he had more to lose than the average witness if he were held in contempt of court. As discussed above, counsel is given significant freedom to determine the parameters of his or her closing argument. The State did not mislead the jury by stating that Duffin would have been held in contempt of court had he refused to testify or that any witness who refuses to testify may be held in contempt of court. To the extent that Shelton's counsel believed that it was important for the jury to be aware that if Duffin was held in contempt of court, his pre-release status would be revoked and he would be sent back to

jail, she was free to make that point as part of her closing argument. Therefore, the court acted within its sound discretion when it overruled Shelton's objection to the prosecutor's closing argument.

■■■ Even if the prosecutor's statement was improper, reversal is not warranted in this case. In *Wilhelm*, 272 Md. at 415–16, 326 A.2d 707, the Court of Appeals discussed what is required for a reversal based on improper statements by a prosecutor:

> [T]he fact that a remark made by the prosecutor in argument to the jury was improper does not necessarily compel that the conviction be set aside. *Conway v. State*, 7 Md. App. 400 [256 A.2d 178 (1969)]. The Maryland Rule is that unless it appears that the jury were actually mislead or were likely to have been mislead or influenced to the prejudice of the accused by the remarks of the State's Attorney, reversal of the conviction on this ground would not be justified. *Wood v. State*, 192 Md. 643 [65 A.2d 316 (1949)]; *Holbrook v. State* [6 Md.App. 265, 250 A.2d 904 (1969)].

(Quoting *Reidy v. State*, 8 Md.App. 169, 172, 259 A.2d 66 (1969)). In *Spain v. State*, 386 Md. 145, 158, 872 A.2d 25 (2005), the Court of Appeals reiterated that "reversal is only required where it appears that the remarks of the prosecutor actually misled the jury or were likely to have misled or influenced the jury to the prejudice of the accused." (Citation omitted). The Court further stated that "[w]hen assessing whether reversible error occurs when improper statements are made during closing arguments, a reviewing court may consider several factors, including the severity of the remarks, the measures taken to cure any potential prejudice, and the weight of the evidence against the accused." *Id.* at 159, 872 A.2d 25 (citations omitted). *See also Donaldson v. State*, 416 Md. 467, 497, 7 A.3d 84 (2010); *Washington v. State*, 191 Md.App. 48, 108, 990 A.2d 549 (2010).

Here, it is particularly unlikely that the jury was misled by the prosecutor choosing not to address the impact that being

held in contempt of court would have on Duffin. The prosecutor's remarks were not severe as it was an isolated remark and Shelton's counsel had an opportunity in her closing argument to bring any additional pertinent facts to the jury's attention and to explain their significance in his closing argument. Moreover, the court instructed the jury before closing arguments that the arguments presented by each side were not evidence in the case. Specifically, the court stated:

> Opening statements and closing arguments of the lawyers are not evidence in this case. They are intended only to help you to understand the evidence and to apply the law. Therefore, if your memory of the evidence differs from anything the lawyers may say or that I may say, you must rely on your own memory of the evidence.

In *Wilhelm*, 272 Md. at 443–44, 326 A.2d 707, the Court of Appeals concluded that "the trial court's instructions to the jury concerning statements and arguments of counsel not to be considered evidence, and his direction that they find their facts only from 'what you have heard from the witness stand and the exhibits which have been received,' sufficiently eliminated any possibility of prejudice." (Citation omitted). Therefore, even if the prosecutor's statement was improper, reversal is not warranted because Shelton had an opportunity to address the facts omitted in the prosecutor's closing argument, and the court instructed the jury that closing arguments were not evidence, thereby eliminating the possibility of prejudice.

For all of the foregoing reasons, we affirm the judgments of the circuit court.

**JUDGMENTS OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANT.**